### THE JOSEPHINE.

District Court, E. D. Pennsylvania. February 5, 1930.

### No. 20.

Acker, Manning & Brown, of Philadelphia, Pa., for plaintiff.

Howard M. Long, of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. The cause of complaint here is the damaged condition in which a cargo of case oil, committed to the respondent vessel for carriage, was delivered. An analysis of the pleadings in the light of the discussion of the evidence by the proctors of the respective parties discloses that the cause of action is dependent upon two fact findings: (1) The seaworthiness of the vessel; (2) whether the unseaworthiness of the vessel—if it existed—contributed to the cargo damage.

Some general observations will serve to relieve the mind of any one whose duty it is to make these fact findings, even if they are of no direct aid in the discussion.

The first is that we are dealing with a shipment made and a cargo averred to have

been damaged in the early part of 1918, with the evidence developed through a trial hearing concluded late in the year 1929. No satisfying fact finding could possibly be made under the conditions produced by such a lapse of time. The trial hearing was concluded at the end of November, 1929, but a ruling has been withheld pending the receipt of the final briefs. These were not sooner submitted by counsel out of consideration for the trial judge whose illness intervened. Counsel have further earned our gratitude by expressing themselves to be in accord on what is the controlling question in the cause. This is, Was the schooner seaworthy when the cargo was taken aboard? We have doubled this question for a reason which will later appear. The Harter Act deals with the subject of the reciprocal duties and rights of common carriers by sea. It imposes upon shippers and carriers a policy of the law. It seeks to distinguish between those risks of loss from which shippers should protect themselves by insurance and those for which they can look for protection to the carrier vessel and its owners. It changes the general obligation of a carrier from that of safe carriage to that of due diligence in providing efficient instrumentalities by enacting that, if ·this duty of due diligence is performed, the carrier vessel and owners are exempted from liability for the casualties due to perils of the sea and the results of errors of navigation. Incidentally it forbids the carriers to relieve themselves by contract of the responsibility imposed upon them by law. There are, however, common carriers and mere carriers. The relations of the latter are commonly the creatures of contracts. Out of this has grown in practice an anomaly. This springs from inserting among the other covenants of a charter party one that it shall be subject to all the provisions of the Harter Act. We have such a provision here along with a covenant of seaworthiness. The latter covenant is performed only by supplying a vessel which is in fact seaworthy; the Harter Act (46 USCA §§ 190–195) imposes only the duty of due diligence. The distinction may be of all importance as, for instance, in the case of a latent defect. Considerable space has been devoted to the distinction in the briefs submitted.

Under the fact situation here presented, however, we see no importance in the distinction or value in preserving it because due diligence and seaworthiness came to be one and the same. Sometimes the distinction is of value, as in the Agwimoon Case (D. C.) 24 F.(2d) 864, where there was a covenant

against loss by leakage, however caused, and another covenant of due diligence only. The question then became which controlled.

Here, however, there is no such covenant, and the averred unseaworthiness is ascribed to a vessel in a leaky condition due to age, previous strains, absence of proper caulkage, and rotten timbers and planks. Obviously due diligence would have disclosed this condition if it existed. Hence we say that one finding finds the other. This one finding is, in this respect, whether this schooner was in fact seaworthy.

■ There is another distinction and difference which is of prime importance here. This is between a fact and how that fact shall be made to appear. We have here the two facts of cargo damage, and that it is due to leakage. The other fact is the one of which we are in quest. Was the leakage due to the unseaworthy condition of the vessel or, for instance, to a peril of the sea? There is an adage, phrase, or principle known as the res ipsa loquitur doctrine. This sometimes voices a rule of law, but sometimes it is used, not to express a rule of evidentiary or any kind of law, but merely to state the reason for reaching a fact conclusion. When something is every day being done by many people, and is ordinarily and commonly done without mishap, and when the reasonable expectation is that with due care it can be done without damage or loss, then the inference is a fair one that mishap means negligence. When, therefore, an unusual and unexpected loss occurs, and no cause for it other than negligence is in sight, the fact of negligence may be found from the happening of the loss. There is, of course, nothing conclusive about it, and it is open to rebuttal. It is merely a prima facie tentative conclusion, nothing else appearing. So far as the res ipsa liquitur doctrine is a rule of law, it is founded upon a policy of the law. This policy is not only a wise one, but it has a just fact inference basis. Goods in carriage are committed to the carrier. Neither the owner nor shipper can be expected to know what happens to them while in the hands of the carrier. The latter, however, should know, and it is just to put upon him the burden of explanation of the loss. It is thus seen that the maxim, so far as it is one of law, is nothing more than the regulation of the burden of proof. In the case of common carriers who are subjected to the enforcement of a policy imposed by law, their obligation to carry safely approaches the responsibility of an insurer. It follows that the fact inference of unseaworthiness is war-

ranted until and unless the carrier shows the damage suffered by this cargo was due to a peril of the sea or some cause other than the unseaworthiness of the vessel.

Is the damage to this cargo ascribable to a "peril of the sea?" Many attempts have been made in judicial opinions and by text-writers to define this phrase. We are far from having in mind a thought of criticism of any of them. Many are truly admirable, and yet the highest praise which can be given them is that they are as good definitions as could be framed because the phrase does not lend itself to accurate definition. It has always (with exceptions) been open to any one charged with negligence or with nonperformance of a covenant to introduce the defense of vis major, acts of Providence, and the like. Perils of the sea must in consequence mean something else when used in charter party or Harter Act exemptions from liability. This schooner encountered storms of such severity as to be called "hurricanes." Any one would list hurricanes among the perils which await those who go down to the sea in ships. Is a hurricane any more or less a peril because of the circumstance that it was to be expected or not expected on a particular voyage? Winds blow at all times, and it is clear enough that a blow, if no more than vessels meet on every voyage, would not be classed as a peril of the sea. None the less, the peril lies, not only in the blow, but just as really in the absence of skill in the handling of the vessel or in the place or conditions at and under which encountered. The real cause of a loss met during a storm might thus be due, not to the storm, but to errors in navigation which put the vessel in a position of danger. A storm when encountered in the open sea, where there was plenty of sea room, might not be reckoned a peril when the same storm or a less one which struck a vessel when near the breakers of a lee shore might be deemed to be a real peril. The degree of violence of the storm is in consequence not the sole or even the real test of what is a peril of the sea. Again, if a storm of great and unexpected violence was encountered by which a seaworthy vessel was swamped and foundered, the loss of ship and cargo would unhesitatingly be ascribed to a peril of the sea, but, if the ship by skillful handling so far weathered the storm as not to founder, but the buffeting strain to which she was subjected opened her seams, and the cargo was thereby damaged, the real cause of the damage would be the same. The finding to be made thus is seen not to depend upon a verbal definition but upon the fact finding of the cause of the damage.

Just here comes in the other distinction, before adverted to, the discussion of which was deferred until this time. Negligence is the real basis of the finding to be made. Was the damage due to the fault of the carrier in not providing a seaworthy vessel? Negligence under the law maritime does not differ from negligence at common law. The distinction referred to is that between negligence and actionable negligence. To constitute actionable negligence, there must be not only negligence but negligence which contributed to the damage.

Hence we have the second question of the two into which we have divided the broad question before us. Applied to the facts of this case, this means that, although there was a storm which reached the dignity of a peril of the sea, if the leaky condition of the schooner contributed to the damage to the cargo, the carrier would be answerable, although the unseaworthiness of the vessel was not the sole, or even the main, cause of the damage.

This takes us again to the real fact finding to be made. A satisfying answer to the question which brings out the finding is, as we have said, one difficult to make, and we state the conclusion we have reached with misgivings. Under all the evidence, however, the finding which we make is that the schooner was seaworthy within the meaning of the charter party and the Harter Act incorporated therewith. Among the reasons which have influenced us in reaching this conclusion are the following:

(1) The libelants accepted this vessel as one safe to carry this cargo. This is a mere circumstance, because the libelants had the right to rely upon the covenant of seaworthiness, and are not to be prejudiced by their acceptance of the vessel. None the less, it is a circumstance of some significance that there was nothing in the appearance of the schooner which suggested unseaworthiness or called for comment at the time, and the signs of the kind of unseaworthiness suggested are to the eyes of those familiar with vessels unmistakable. The significance is not in the fact that the cargo was put aboard the schooner but in the other fact that her unseaworthiness was not at the time remarked.

(2) The admitted facts that the schooner met storms in the Gulf of Mexico and on the Atlantic of sufficient violence to force her to seek a harbor of refuge, and sufficient to have subjected her to strains which would have

brought on a condition of leakiness which did not before exist.

(3) The fact that the cargo was of the type which would subject a vessel to the least strain. This fact we are aware cuts both ways. We list it among the significant facts because of the criticism of this schooner that she was designed and built for the carriage of light cargoes, and was unfitted for the general carrying trade, and was in this sense unseaworthy. A vessel fit to carry any cargo was fit to carry this one.

(4) The fact, and to our mind this is of much importance, that no leakage developed until after the schooner had been pounded in the storms she encountered. Had her leaky condition been due to her unseaworthiness at the commencement of the voyage, leaks would have been in evidence before and without her hurricane experiences.

We repeat an expression of the misgivings with which we have reached the conclusion stated, but we find comfort in the thought that the risk of the damage here done is a risk against which a shipper protects himself not by reliance upon the covenants of his charter party, but are risks against which he should and can and does protect himself by insurance.

The libel is dismissed, with costs.