## FEDERAL ELECTRIC CO., Inc., v. TAYLOR.

Circuit Court of Appeals, Eighth Circuit.
April 18, 1927.

No. 7301.

1. Negligence ⟨⟩121(2)—Doctrine of res ipsa loquitur is inapplicable when specific negligence is alleged.

The doctrine of res ipsa loquitur cannot be invoked when specific negligence is pleaded.

2. Master and servant ⟨⟩278(11)—Charge of negligence, in that electric sign on which plaintiff worked, when he received shock was defective and unsafe, held not sustained.

In an action for injury to plaintiff by falling from a platform from which he was working on an electric sign, caused by his receiving an electric shock, the charge of negligence of the defendant employer in permitting the insulation to be grounded and short-circuited *held* not sustained by evidence; it being shown that grounding the metal framework of the sign, as was done, was not only customary, but required by law.

In Error to the District Court of the United States for the Eastern District of Missouri; Charles B. Faris, Judge.

Action at law by Leslie Taylor against the Federal Electric Company, Incorporated. Judgment for plaintiff, and defendant brings error. Reversed.

John S. Marsalek, of St. Louis, Mo. (W. E. Moser, of St. Louis, Mo., on the brief), for plaintiff in error.

James T. Blair, of St. Louis, Mo. (Foristel, Mudd, Hezel & Habenicht, of St. Louis, Mo., on the brief), for defendant in error.

Before KENYON, Circuit Judge, and MOLYNEAUX and OTIS, District Judges.

MOLYNEAUX, District Judge. The defendant in error, hereinafter referred to as plaintiff, brought this suit to recover damages from the plaintiff in error, hereinafter referred to as the defendant. The plaintiff's injuries were sustained by him by reason of his falling from a narrow platform, while engaged in work in the service of the defendant upon an electric sign.

The sign involved was built upon the top

of a canopy extending out from the theater building across the sidewalk. On the north and south sides of the canopy there were illuminated electric signs, so arranged that large letters could be placed thereon. Extending along the base of the sign was a platform eight or ten inches wide, on which the men stood in performing this task. The inside of the platform was about six inches from the face of the sign. Extending horizontally across the face of each of the signs were three metal straps. At the top of each letter were two iron hooks; there were two plugs and a number of metal posts at the bottom. The letters were affixed to the sign by catching the hooks over the metal straps. The plugs and posts were pushed into the sockets in the face of the sign, thus connecting up the electric current to the letter. The wiring was on the inside of the letter. While changing the letters, the men also replaced burned-out bulbs. It was customary for the current to be turned on while this work was being carried on. The sign was built up of metal angle iron and was closed in. The metal conduits, consisting of iron pipe, came into the sign. The electric wires were inside the pipe. At different points along the pipe the wires were brought out through the porcelain insulators to different taps along the sign. There is a conduit running along each row of letters. There are no exposed conductors of electricity on the sign, except the conduits on the inside of the porcelain insulators, and these are set back. In one socket the thread shell was charged, and in the alternate socket the center contact inside of the base was charged. This was the usual construction, and the same are to be found in every household. In unscrewing the bulb, one's hand would necessarily come very close to the socket. By touching the charged side, and at the same time touching some metal that is grounded, one would receive a shock.

The sign is known as a three-wire sign. The wires carried 230 volts from the source of supply, the light pole; 115 volts were used for lighting the letters and the other 115 volts were used for lighting the upper or decorative part of the sign. There were three wires from the electric pole to the sign. The center wire is the neutral line, and is grounded to the earth at the transformers on the pole and at the power plant. All the wires, with the exception of the neutral wire, are clear of the ground; but the sign itself—that is, all framework, metal work, conduit work, and structural iron work—is bonded together and grounded to

the earth through the structural iron work of the building, so that, in case of a short circuit, the metal work would carry the current to the ground and blow the fuse immediately.

The expert witness for the defendant testified that as a result of this grounding it was possible, without any mechanical defect in the sign, to obtain an electric shock by touching the metal part of the sign, at the same time touching the metal part of the globe on the live side, and in so doing you would complete the circuit from the live side of the socket to the framework, which is the same as the neutral wire. If a sign were not grounded, and one touched the metal part of the sign and touched the contact, he could not get a shock, because there would be nothing to complete the circuit, unless he touched one side of the circuit in the letters and the other side of the same circuit in the upper or decorative part of the sign.

The grounding of the metal parts of the sign was the usual construction required by law, and was customary and usual. The Underwriters' regulations specifically state that any metal parts in any conduit must be bonded together and grounded to the earth. At the time of the accident it was raining. The outer portions of the glass bulb and the platform on which the plaintiff was standing were wet. As to the happening of the accident, the plaintiff testified that he was standing on this platform, and with his right hand was in the act of unscrewing a burned-out bulb from one of the letters in the top row of the sign, and was holding onto the metal framework of the sign with the other hand, when he received a shock which caused him to jerk his hands. He tried to catch himself; he grabbed one of the letters, which came out of the socket, and he fell. He testified that no part of his hand was touching the metal part of the bulb. He testified he had received a number of slight shocks while working on this sign at other times before the day of the accident. In dry weather these shocks were not so severe. He testified that he did not remember of receiving any shocks on the day of the accident, other than the one which caused the accident. He had about finished changing the sign when he received the shock.

To prove that the sign was defective, plaintiff introduced the witness Robert F. Stephenson, who stated that he was connected with the office of the plaintiff's attorneys. In relating his experience in electrical work, he testified that he had installed

illuminating systems in mines in Illinois for the Philadelphia Storage Battery Company. He had much experience in putting up wire and making circuits and things of that kind. The witness stated he did some work making, assembling, and installing parts. Over the objection of the defendant, that the witness had shown no proper qualifications and was not shown to have any knowledge of the construction of the particular sign in question, the witness was permitted to testify that shocks from electricity could not be produced by anything except a short circuit, and that this sign must have been defective, or the plaintiff could not have received the shock; but on cross-examination of the witness he qualified his testimony. He testified as follows:

"Q. The sign might be in perfect condition in every mechanical respect, and the man might get a shock on this sign? A. Yes, sir.

"Q. Water is a conductor of electricity? A. Yes, sir.

"Q. If this glass part of the bulb has water on it, and it is being screwed in the socket, one hand is touching the sign, and the sign is grounded, could a shock be sustained? A. Yes sir.

"Q. Without any mechanical defect of any kind in the sign? A. No, sir.

"Q. Is that true? A. No, sir; the sign some place would have to be grounded.

"Q. Do you consider the grounding of the sign a defect? A. No; that would be the short circuit—where there is something wrong with the sign.

"Q. I will state it over again: With the glass part of the bulb having water on it, one hand touching the sign, and the other touching this water-covered bulb, the sign being grounded, could a shock be sustained? A. Yes sir.

"Q. Would that involve any defect or insufficiency in the sign? A. Yes; I believe it would.

"Q. What would be the defect? A. It would be the short-circuit in that sign at some place.

"Q. What place? A. I couldn't tell you; you would have to trace it out.

"Q. Where would the electricity come from in order to give the shock; where would it enter the body, from where? A. I don't know from where it would come.

"Q. Would it not come from the circuit formed by the water? A. Yes; you connect up your circuit there, but probably you may put the hand to hold onto the metal part of the frame.

"Q. Would not that be because it was grounded? A. It can be grounded, understand, but not so that the frame is grounded, so you get a shock."

The charge of negligence on which the case went to the jury was that the electric shock, which resulted in the fall and consequent injury of the plaintiff, was caused by defendant's negligence, in permitting "the insulation on the electrically charged wires, the bulb sockets, the metal frame, and the electric connections of said electric sign" to be "grounded and short-circuited by reason of which they were likely to produce electric shocks." There were other grounds of negligence alleged, but the case went to the jury in the court below on the alleged ground of negligence above referred to only. The learned trial judge took from the consideration of the jury all other alleged grounds of negligence, and we think properly did so.

Plaintiff introduced no direct evidence to prove the charge of negligence on which the case went to the jury. There was no testimony of any missing insulation. No witness stated that either the bulb sockets, the metal frame, or the electric connections of the sign in question, were grounded, short-circuited, and charged with electricity, except to the extent that they were intended and required to be so charged and grounded in the proper and usual construction of such a sign, and as was customary and lawful to do. At the close of the evidence the defendant moved the court to instruct the jury to return a verdict in favor of the defendant and against the plaintiff, on the ground that the evidence was insufficient to warrant the jury in finding in favor of the plaintiff. This request was refused, and duly excepted to. The failure to give this request is assigned as error.

1. The record shows conclusively that the plaintiff could not recover on the allegations relative to the narrowness of the platform, its proximity to the sign, or the lack of railing or banisters. All these conditions were open and obvious, and were known and fully understood by the plaintiff. That he assumed whatever risk arose therefrom is too well established to require discussion. The court below properly so held. Amer. Car & Fdy. Co. v. Allen (C. C. A.) 264 F. 647.

2. The question presented for determination is whether there was any substantial evidence in the record to support a verdict in favor of the plaintiff on the allegation that the shock which resulted in the fall and consequent injuries of the plaintiff was

caused by defendant's negligence in permitting "the insulation on the electrically charged wires, the bulb sockets, the metal frame, and the electric connections of such electric sign" to be "grounded and short-circuited, by reason of which they were likely to produce electric shocks."

[1] The principles of master and servant apply to the situation, and the burden of proof was upon the plaintiff to prove the charge of negligence set out in his petition. There was no evidence whatever to sustain the charge of negligence, unless it be the testimony of the so-called expert witness, Stephenson. Obviously the mere proof of an electric shock was not sufficient. The res ipsa loquitor doctrine does not apply, and can never be invoked when the specific negligence is pleaded. Bean v. Independent Co. (C. C. A.) 4 F.(2d) 504; Rice v. White (Mo. Sup.) 239 S. W. 141.

[2] The evidence does not show any circumstances from which it could be reasonably inferred that any such defect existed, unless, as stated, the testimony of the expert witness may be considered. The precise question to be answered is whether, from the evidence that plaintiff sustained previous shocks while in some undefined position about the sign, and from the shock received by him on the occasion of his injury, it can be reasonably inferred that the defendant was negligent in permitting the insulation on the electrically charged wires, the bulb sockets, the metal frame, the electric connections of the sign, or any of them to be grounded and short-circuited, and charged with electricity or, in other words, can a short-circuit be inferred from the fact of the shock under the circumstances as they existed?

If, with the sign in proper condition, there was no way that the plaintiff could obtain an electric shock while in the position he occupied at the time of his injury, reasonable men might conclude from such evidence that there was some defect in the sign. But the evidence demonstrated that shocks could be obtained in the absence of any mechanical defect whatever, under the circumstances and conditions shown to have existed at the time plaintiff received the shock. It is common knowledge that an electric shock will be obtained wherever a connection is formed between the positive and negative wires or poles, or between a positive pole or wire and the ground. It is common knowledge that the likelihood of forming a contact increases where moisture is present.

The courts take judicial notice of the primary and commonly known laws of physics. 23 C. J. p. 143.

Shephenson, introduced as an expert by the plaintiff, and witnesses Scullen and Crane, all agreed that with one hand in contact with a bulb covered by a film of water a short circuit could be obtained by placing the other hand upon the iron frame of the sign which was grounded, in which case the film of water on the glass would conduct the current from the charged contacts within the socket to the hand on the bulb, and it would flow through the body and other hand, by way of the frame, to the ground. The evidence of the so-called expert, Stephenson, shows that there was a confusion of ideas in his mind concerning the question on which he was testifying; at least there is considerable confusion in the way he expresses himself, and we think it is apparent from his testimony that he supposed the mere fact that the framework of the sign was grounded was a defect, whereas the evidence shows it is the usual and customary way and is required by law. He admitted that the sign could be in perfect mechanical condition, and that a shock could be obtained by placing one hand on the grounded metal part of the sign, while the other was in contact with a wet bulb.

Mr. Stephenson's testimony, when analyzed, shows that he did not understand that the sign was grounded, and the fact that it was grounded was, in his mind, a defect. His experience had only extended to electric signs which obtained their current from an electric storage battery in which case, because of necessarily small voltage, there would be no necessity for grounding the metal work of the sign, and the current would run from the positive pole to the battery, through the wiring and bulbs to the negative pole. In answering the question: "Would you ground a sign when you wired one like this?" He answered: "We did not; we used a storage battery." But this sign was grounded as was customary and required by the law, and according to his own testimony a shock could be received on such a sign by placing the hand as did this plaintiff on a wet bulb and the other hand upon the grounded metal sign.

We think there is no substantial evidence to support the verdict. Having come to this conclusion, it is unnecessary to consider the other assignments of error.

The judgment of the court below is reversed.