## MAY DEPARTMENT STORES CO. v. BELL.

No. 9453.

Circuit Court of Appeals, Eighth Circuit.

Nov. 12, 1932.

Ralph T. Finley, of St. Louis, Mo. (James C. Jones, Lon O. Hocker, Frank H. Sullivan, and Frank Y. Gladney, all of St. Louis, Mo., on the brief), for appellant.

William H. Allen, of St. Louis, Mo. (Mark D. Eagleton and John S. Marsalek, both of St. Louis, Mo., on the brief), for appellee.

Before GARDNER and SANBORN, Circuit Judges, and NORDBYE, District Judge.

SANBORN, Circuit Judge.

This appeal is from a judgment entered upon the verdict of the jury in an action, brought by the appellee against the appellant to recover for personal injuries. The appellee will be referred to as the plaintiff, and the appellant as the defendant, as in the court below.

On April 5, 1928, the defendant was the proprietor of a department store in St. Louis, Mo., known as Famous & Barr Company. For the convenience of patrons who desired to descend from the first floor to the basement, the defendant operated an escalator or moving stairway. This was a device consisting of an endless belt passing from the first floor to the floor of the basement. The belt upon which the passengers rode had cleats upon its upper surface, and where the belt passed into and through the floor of the basement there was a metal plate referred to as a comb plate. This plate had eight teeth (fingers, prongs, or tines) between which passed the ribs of the descending cleats. The spaces between the teeth of the comb plate were sufficiently narrow so that the feet of passengers upon the belt could not enter the apertures between the teeth. The function of the comb plate was to remove the feet of passengers from the belt as they reached the basement floor, and thus to place them safely on the floor of the basement.

Jimmie Bell, the plaintiff, brought this action, alleging: "That on the aforesaid date

one of the aforesaid teeth of said comb-plate was missing from said comb-plate thus permitting a space to exist which was sufficient to permit the plaintiff's foot to be caught therein, and plaintiff's foot was caught therein and was injured thereby, all of which occurred through negligence and carelessness on the part of the defendant, and as a direct and proximate result of said negligence and carelessness on the part of the defendant plaintiff was seriously and permanently injured." The defendant's answer was a general denial.

Two issues were thus presented for determination: (1) The issue of liability; (2) the issue of damages.

At the close of the testimony, the defendant moved for a directed verdict on the ground of the insufficiency of the evidence to support a verdict for the plaintiff. This motion was denied. In submitting the case, the court instructed the jury that the burden was upon the plaintiff to prove that the defendant was negligent, but also said: "This case, gentlemen, is what the law calls a res ipsa loquitur case. We use the Latin expression, which simply means, the thing speaks for itself, that is, an accident having occurred, and plaintiff being an invitee, a presumption of negligence arises, and that presumption will take the case to you gentlemen, unless it is rebutted by evidence coming into the case."

The defendant excepted to this instruction.

In submitting to the jury the issue of damages, the court gave the following instruction: "Of course, if you shall find and believe from the evidence that his (the plaintiff's) resistance was lowered, and that solely by reason of such resistance being lowered he took tuberculosis, when he would not have taken it but for the lowering of his resistance by the hurts to his foot, then you are warranted in finding that the tuberculosis from which, evidently, he had been suffering, but which is now, from the testimony of the witnesses, probably arrested, was thus indirectly caused by this hurt. If it was caused by this hurt, in the manner to which I have called your attention to, then you are warranted in considering that when you come to the question of compensation, should you reach that question."

This instruction was also excepted to by the defendant, because of insufficient evidence to justify a finding that the plaintiff's tubercular condition was the result of the injury to his foot.

Since the questions arising in connection with the issue of liability and those arising from the issue of damages are separate and distinct, they will be discussed separately in this opinion.

The first question is whether, under the evidence, the plaintiff was entitled to invoke the maxim "res ipsa loquitur."

The second question is whether, under the pleadings, the plaintiff was entitled to invoke that maxim.

The third question is whether, if the maxim applied under the plaintiff's pleadings and proof, the defendant's evidence so far rebutted the presumption or inference as to require the trial court to direct a verdict.

The fourth question is whether the evidence justified the court in permitting the jury, on the issue of damages, to take into consideration the plaintiff's tubercular condition, which was claimed to have been caused by the accident.

These questions will be discussed in their order.

1. In considering the question of the liability of the defendant, it is necessary to set out the substance of the testimony upon that issue.

It is uncontroverted that on April 5, 1928, Jimmie Bell, then four years of age, accompanied by his grandmother, was a passenger on the escalator, and that, as they reached the basement floor, the child's left foot was caught between the belt and the comb plate in the space occasioned by the breaking of one of the teeth of the comb plate. The grandmother testified as to the happening of the accident. William A. Kenny (a witness for the plaintiff), who had been employed by the defendant for nine years and who was an electrician at the store on the day of the accident, described the operation of the belt and comb plate, and said that he was called to release the plaintiff's foot and was obliged to remove the comb plate and to raise it; that he found the foot wedged in the aperture caused by the breaking of one of the teeth. On cross-examination, he said that the teeth of the comb plate are a part of the casting; that they extend from the plate in the form of a finger; that they were sometimes broken. He was asked what the common causes of breakage were, and said:

"Well, I couldn't say what the causes are. I have never seen one in the actual breaking, but I imagine it could be produced by some foreign substance getting in there, that is between the cleats and getting down under

the prong putting a strain on it and breaking it, such as a heel, maybe.

"Q. Women's narrow, high heels, and umbrella tips? A. Yes, sir."

He testified that a supply of plates was kept; that the tooth which broke on this occasion broke close to the plate; that the break was a fresh one; that the escalator was made by a reputable manufacturer. The court inquired of him how often in his experience the teeth of the comb plate break, and he replied:

"Well, I couldn't say exactly, but they break off frequently enough to have us keep extra plates there in the place. I should say, in my time there, that I have changed plates where that has happened at least a half dozen times.

"Q. In what length of time? A. Nine years."

He further stated that what he would call a thorough inspection of the escalators was made once a week; that there was a general order to all of the maintenance force to watch always for anything wrong on an escalator, especially the teeth of the comb plate being missing and the cleats being broken; that the plates kept for emergencies were bought from the manufacturer of the escalator and were the same as those furnished with the escalator; that later the manufacturer put out a new plate with a reinforcing rib at the base of the teeth.

The plaintiff offered no other evidence upon the issue of liability.

The defendant's evidence on this issue was substantially as follows:

The chief engineer of Famous & Barr Company testified that there were in the store about ten escalators under his supervision; that these escalators were purchased from the largest manufacturer in the country; that there was an inspection of the escalators at different times each day, one in the morning about the time the store opened, again at noon, and again in the afternoon toward the close; that his foreman makes an inspection throughout the day, and that in going to and from the floors they ride the escalators and elevators to observe their operations and see that they are in running condition; that, if they find anything wrong with any escalator, it is immediately shut down and taken out of service; that at the head of each escalator there is some one to watch the operation and the passengers; that at the time of the accident there was some one in attendance; that he (the chief engineer) was then riding an upper floor escalator and had come up the escalator in question and had observed it, and was either up on the second or third floor; that, when informed of the accident, he went back to the basement; that one of the teeth of the comb plate had been broken off; that it was handed to him; that the break was a fresh one; that they had the tooth welded back upon the comb plate to be used as a spare. On cross-examination, he stated that broken comb plates were sent to a welding company for repair; that during his experience there had been no part of the escalator which had ever caused a tooth to break; that breakage had always been due to some outside contributing cause, such as umbrellas, or heels of ladies' shoes, or a cane, or something like that.

Betty Wallace testified that she was in attendance at the escalator at the time of the accident; that she stood on the first floor at the top of the escalator near a switch where she could turn off the power; that the first she knew of the accident was when she heard the plaintiff scream; that she turned the switch and stopped the escalator; that there were many people upon it at the time, and that it was always crowded running from the main floor to the basement; that this happened about 11 o'clock; that she could not see the boy from where she was, on account of the number of people; that she had noticed the bottom plate having tines on it before the accident, but had seen nothing wrong with one of them; that she does not know how the accident happened, or how the tine broke. On cross-examination, she stated that there were times when she could see down to the bottom of the escalator very clearly; that the distance is around forty feet. She said:

"We watched the comb-plate all the time to determine whether or not a prong or tooth was out. One had never come out while I was there, but I was instructed by Mr. Houck, the captain of the escalator operators, to be on the lookout for such a thing occurring. At that time I was a relief girl. I only gone and let this girl off for a while, and the next girl off a while. I just happened to be there at the time; I just walked up to let the relief girl off when the accident happened. When I relieve the girls I walk up—if there is anything wrong they are supposed to tell me about it, and my attention was not directed to that matter before the accident. I am on duty there only fifteen minutes for relief and one-half hour for lunch. When you are on the escalator on duty thirty minutes or fifteen minutes, you keep looking down all

the time—constantly—to see if the teeth are there."

On redirect examination, she stated: "I face that direction all the time, looking down the escalator to see if everything is all right, and I saw nothing wrong before the accident that morning."

John Truhe stated that he had been an electrician for the defendant for thirty-six years, and was so employed at the time of the accident; that his duties were to look after the electric appliances; that he goes over the escalators frequently and makes a general inspection of them every Sunday. He said: "I was not there at the time the accident of that morning occurred; I was at dinner. I had seen this particular escalator, the one that goes from the first floor to the basement, that morning, and had noticed nothing wrong with the plate. These plates are kept on hand so that they can be replaced when a tine breaks, or anything happens."

It is not entirely clear whether some of the witnesses who testified as to inspection were referring to present practices or to those which existed at the time the accident occurred.

Perhaps the most quoted, simplest, and best statement of the law with reference to the application of the maxim "res ipsa loquitur" is that of Chief Justice Erle in Scott v. The London & St. Katherine Docks Co., 3 Hurlst. & C. 596, 159 Eng. Reprint, 665. The accident out of which that case arose was the falling of six bags of sugar from the defendant's warehouse upon the plaintiff. In holding that the question of negligence was for the jury, the court said (page 601 of 3 Hurlst. & C.): "There must be reasonable evidence of negligence. But where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care." 59 A. L. R. 469.

Another statement frequently quoted is: "All that is meant is that the circumstances involved in or connected with an accident are of such an unusual character as to justify, in the absence of any other evidence bearing upon the subject, the inference that the accident was due to the negligence of the one having possession or control of the article or thing which caused the injury. This inference is not drawn merely because the thing speaks for itself, but because all of the circumstances surrounding the accident are of such a character that, unless an explanation be given, the only fair and reasonable conclusion is that the accident was due to some omission of defendant's duty." McLaughlin, J., in Francey v. Rutland R. Co., 222 N. Y. 482, 484, 119 N. E. 86, 87.

Judge Holmes (later Mr. Justice Holmes) in the case of Graham v. Badger, 164 Mass. 42, 47, 41 N. E. 61, said: "'Res ipsa loquitur,' which is merely a short way of saying that, so far as the court can see, the jury, from their experience as men of the world, may be warranted in thinking that an accident of this particular kind commonly does not happen except in consequence of negligence, and that therefore there is a presumption of fact, in the absence of explanation or other evidence which the jury believe, that it happened in consequence of negligence in this case." 59 A. L. R. 469.

See, also, Ellis v. Waldron, 19 R. I. 369, 33 A. 869; Plumb v. Richmond L. & R. Co., 233 N. Y. 285, 135 N. E. 504, 25 A. L. R. 685; Chenall v. Palmer Brick Co., 117 Ga. 106, 43 S. E. 443; The Josephine, 37 F.(2d) 928, 930 (D. C. E. D. Pa.), affirmed in 49 F.(2d) 207 (C. C. A. 3).

The duty imposed by law upon a carrier by escalator for the care and protection of passengers has been held by this court to be the same as the duty imposed upon a carrier of passengers by stagecoach, train, or elevator. Kresge Co. v. McCallion, 58 F.(2d) 931, 932. Quoting from the opinion: "An escalator carries people, often many at the same time, from one floor of a building to another. It seems clear that there is the possibility of great injury in its operation. Suppose the steps should suddenly fold up hurling the people upon it down to the lower floor in a heap or should violently stop or start while a person is being carried on the steps. For instances, see Petrie v. Kaufmann & Baer Co., 291 Pa. 211, 139 A. 878, and McBride v. May Dept. Stores Co., 39 Ohio App. 420, 177 N. E. 773. It can well be regarded as a 'carrier' within the meaning of this rule as to negligence and care. Petrie v. Kaufmann & Baer Co., 291 Pa. 211, 139 A. 878; McBride v. May Dept. Stores Co., 39 Ohio App. 420, 177 N. E. 773. Whether the escalator is technically a 'carrier' or not is really not vital, since the nature of this form of transportation is such that the same degree of care should, at least by analogy, be required. In an elevator case, Judge (later Justice) Lurton (Mitchell v. Marker [C. C. A.] 62 F. 139, 142, 25 L. R. A. 33) said:

'We see no distinction in principle between the degree of care required from a carrier of passengers horizontally, by means of railway cars or stagecoaches, and one who carries them vertically, by means of a passenger elevator. The degree of care required from carriers by railway or stagecoach is the highest degree.' Similarly, we see no distinction in principle in the care required in transporting persons from one floor to another on an escalator slanted at forty-five degrees."

█ It follows that the rule as to what evidence will make a prima facie case in favor of an injured passenger is the same whether the accident which caused the injury occurred upon an escalator, an elevator, or a railway car.

In the case of Gleeson v. Virginia Midland Railroad Co., 140 U. S. 435, 443, 11 S. Ct. 859, 862, 35 L. Ed. 458, the court said: "Since the decisions in Stokes v. Saltonstall, 13 Pet. 181 [10 L. Ed. 115], and [New Jersey] Railroad Co. v. Pollard, 22 Wall. 341 [22 L. Ed. 877], it has been settled law in this court that the happening of an injurious accident is, in passenger cases, prima facie evidence of negligence on the part of the carrier, and that (the passenger being himself in the exercise of due care) the burden then rests upon the carrier to show that its whole duty was performed, and that the injury was unavoidable by human foresight. The rule announced in those cases has received general acceptance, and was followed at the present term in Inland & Seaboard Coasting Co. v. Tolson, 139 U. S. 551, ante, 653 [11 S. Ct. 653, 35 L. Ed. 270]."

And further (page 444 of 140 U. S., 11 S. Ct. 859, 862): "The law is that the plaintiff must show negligence in the defendant. This is done prima facie by showing, if the plaintiff be a passenger, that the accident occurred. If that accident was in fact the result of causes beyond the defendant's responsibility, or of the act of God, it is still none the less true that the plaintiff has made out his prima facie case. When he proves the occurrence of the accident the defendant must answer that case from all the circumstances of exculpation, whether disclosed by the one party or the other. They are its matter of defense. And it is for the jury to say, in the light of all the testimony, and under the instructions of the court, whether the relation of cause and effect did exist, as claimed by the defense, between the accident and the alleged exonerating circumstances."

In the case of Southern Railway, Carolina Division v. Bennett, 233 U. S. 80, page 85, 34 S. Ct. 566, 58 L. Ed. 860, which was an action under the Federal Employers' Liability Act (45 USCA §§ 51–59) for causing the death of the plaintiff's intestate, an employee of the defendant, the court used the following language: "The defendant was killed by the falling of his engine through a burning trestle bridge. There was evidence tending to show that the trestle was more or less rotten, that the fire was caused by the dropping of coals from an earlier train, and that the engine might have been stopped had a proper lookout been kept. The first complaint is against an instruction to the effect that, if a servant is injured through defective instrumentalities, it is prima facie evidence of the master's negligence, and that the master 'assumes the burden' of showing that he exercised due care in furnishing them. Of course the burden of proving negligence in a strict sense is on the plaintiff throughout, as was recognized and stated later in the charge. The phrase picked out for criticism did not controvert that proposition but merely expressed in an untechnical way that if the death was due to a defective instrumentality and no explanation was given, the plaintiff had sustained the burden. The instruction is criticized further as if the judge had said res ipsa loquitur—which would have been right or wrong according to the res referred to. The judge did not say that the fall of the engine was enough, but that proof of a defect in appliances which the company was bound to use care to keep in order, and which usually would be in order if due care was taken, was prima facie evidence of neglect. The instruction concerned conditions likely to have existed for some time (defective ash pan or damper on the engine and rotten wood likely to take fire), about which the company had better means of information than the plaintiff, and concerning which it offered precise evidence, which, however, did not satisfy the jury."

See, also, Western Transportation Company v. Downer, 11 Wall. 129, 20 L. Ed. 160; Inland & Seaboard Coasting Co. v. Tolson, 139 U. S. 551, 11 S. Ct. 653, 35 L. Ed. 270; Patton v. Texas & Pacific R. Co., 179 U. S. 658, 663, 21 S. Ct. 275, 45 L. Ed. 361; Kansas City, F. S. & M. R. Co. v. Stoner, 49 F. 209 (C. C. A. 8); Minneapolis Street Railway Co. v. Odegaard, 182 F. 56 (C. C. A. 8); North Jersey St. Ry. Co. v. Purdy, 142 F. 955 (C. C. A. 3); Lee Line Steamers v. Robinson, 218 F. 559, L. R. A. 1916C, 358 (C. C. A. 6).

The maxim has been applied in two cases

growing out of accidents on escalators. Petrie v. Kaufmann & Baer Co., 291 Pa. 211, 139 A. 878; Hesemann v. May Dept. Stores Co., 225 Mo. App. 584, 39 S.W.(2d) 797.

In two other cases growing out of escalator accidents, the maxim, however, has not been applied. Fuller v. Wurzburg Dry Goods Co., 192 Mich. 447, 158 N. W. 1026; Conway v. Boston Elevated R. Co., 255 Mass. 571, 152 N. E. 94.

In the Michigan case, the plaintiff claimed that she was thrown down and injured by a peculiar motion of the escalator. The court refused to apply the maxim, saying: "But in making this contention counsel overlooks the fact that before this inference of negligence can be drawn, something more must be shown than the mere happening of the accident. In the case before us there was no testimony, direct or indirect, as to any negligence in the construction or in the operation of the stairway."

In the Massachusetts case, the hand of a child six years old was caught beneath the moving hand belt of the escalator. No attempt was made to describe the mechanism of the conveyance, and there were attempts to prove specific negligence. The court said (255 Mass. 574, 152 N. E. 94): "The doctrine of res ipsa loquitur is not applicable to the present case. There is no description of the mechanism of the escalator or what method, if any, might have been used to tighten the belt if it became loose, so that at no time could there be a space less than three and one-half inches deep. Nor was there any evidence as to how many persons were using the escalator at the time of the accident or what the strain then was upon the belt or whether, because of such strain, the space between it and the wood beneath was larger than would ordinarily occur. Nor is there any evidence that the belt, when in good condition, would not wave and make a 'slapping' noise. And there is no evidence of any other accidents from the alleged cause to charge the defendant with notice that the belt in question was defective. In other words, by reason of lack of evidence respecting the mechanism of the escalator, it could not properly be said that in the ordinary experience of mankind the accident would not have happened without fault of the defendant. Hence res ipsa loquitur has no application."

Apparently the courts in the cases just referred to were of the opinion that there was no evidence which would justify a conclusion that the injuries were due to a defective instrumentality of which the defendant

had complete control, and that the bare fact of the happening of the accident was insufficient to justify the application of the maxim.

In the case before us, the accident was caused by a defective instrumentality; namely, the comb plate. That this was under the exclusive control of the defendant cannot be controverted. The accident was certainly one which, in the ordinary course of things, does not happen if those who have the management of the instrumentality use proper care. We have no doubt of the applicability of the maxim, unless, by reason of the allegations of negligence made by the plaintiff in his complaint, the maxim could not be invoked.

2. The courts of Missouri have held that the maxim can have no application where the plaintiff in his complaint charges specific negligence; and it is urged that the negligence charged in the complaint in this case is specific.

It is virtually impossible to determine from the Missouri decisions what is to be regarded as an allegation of specific negligence and what an allegation of general negligence. This grows out of a lack of uniformity in the application of the rule, rather than in the statement of it.

For cases holding that allegations are specific rather than general, see: Feary v. Metropolitan St. Ry. Co., 162 Mo. 75, 62 S. W. 452; McGrath v. St. Louis Transit Co., 197 Mo. 97, 94 S. W. 872; Van Horn v. St. Louis Transit Co., 198 Mo. 481, 95 S. W. 326; Orcutt v. Century Bldg. Co., 201 Mo. 424, 99 S. W. 1062, 8 L. R. A. (N. S.) 929; Roscoe v. Metropolitan St. Ry. Co., 202 Mo. 576, 101 S. W. 32; Todd v. Mo. Pac. R. Co., 126 Mo. App. 684, 105 S. W. 671; Joseph v. Metropolitan St. R. Co., 129 Mo. App. 603, 107 S. W. 1055; Davidson v. St. Louis Transit Co., 211 Mo. 320, 109 S. W. 583; Beave v. St. Louis Transit Co., 212 Mo. 331, 111 S. W. 52; Evans v. Wabash R. Co., 222 Mo. 435, 121 S. W. 36; Gardner v. Metropolitan St. R. Co., 223 Mo. 389, 122 S. W. 1068, 18 Ann. Cas. 1166; Cooper v. Century Realty Co., 224 Mo. 709, 123 S. W. 848; Sterrett v. Metropolitan St. Ry. Co., 225 Mo. 99, 123 S. W. 877; Bobbitt v. United Rys. Co. of St. Louis, 169 Mo. App. 424, 153 S. W. 70; Pointer v. Mountain Ry. Construction Co., 269 Mo. 104, 189 S. W. 805, L. R. A. 1917B, 1091; Pate v. Dumbauld, 298 Mo. 435, 250 S. W. 49; Kuhlman v. Water, Light & Transit Co., 307 Mo. 607, 271 S. W. 788; State ex rel. American Car & Foundry Co. v. Daues, 315 Mo. 1229, 288 S. W. 13; Morrow v. Mo.

Gas & Electric Service Co., 315 Mo. 367, 286 S. W. 106; State ex rel. City of Macon v. Trimble, 321 Mo. 671, 12 S.W.(2d) 727; Mendenhall v. Springfield Traction Co. (Mo. App.) 26 S.W.(2d) 50; Rice v. White (Mo. Sup.) 239 S. W. 141.

In the following cases the allegations of the complaint were held to be general: Malloy v. St. L. & Suburban R. Co., 173 Mo. 75, 73 S. W. 159; Estes v. Mo. Pac. R. Co., 110 Mo. App. 725, 85 S. W. 627; Chlanda v. St. L. Transit Co. et al., 213 Mo. 244, 112 S. W. 249; MacDonald v. Metropolitan St. R. Co., 219 Mo. 468, 118 S. W. 78, 16 Ann. Cas. 810; Price v. Metropolitan St. R. Co., 220 Mo. 435, 119 S. W. 932, 132 Am. St. Rep. 588; Briscoe v. Metropolitan St. R. Co., 222 Mo. 104, 120 S. W. 1162; Moore v. Mo. Pac. R. Co., 164 Mo. App. 34, 147 S. W. 488; Stauffer, Adm'r v. Metropolitan St. R. Co., 243 Mo. 305, 325, 147 S. W. 1032; Nagel v. United Rys. Co. of St. Louis, 169 Mo. App. 284, 152 S. W. 621; Patterson v. Springfield Traction Co., 178 Mo. App. 250, 163 S. W. 955; Duffy v. McGee, 196 Mo. App. 395, 195 S. W. 1053; Kean v. Smith-Reis Piano Co., 206 Mo. App. 170, 227 S. W. 1091; Porter v. St. Joseph Ry., Light, Heat & Power Co., 311 Mo. 66, 277 S. W. 913.

Under the holdings in Price v. Metropolitan St. R. Co., supra, Stauffer v. Metropolitan St. R. Co., supra, and Porter v. St. Joseph Ry., Light, Heat & Power Co., supra, the allegation of negligence with which we are concerned appears to be general; while under Feary v. Metropolitan St. Ry. Co., supra, Davidson v. St. Louis Transit Co., supra, and Pointer v. Mountain Ry. Construction Co., supra, the complaint apparently charges specific negligence.

The Circuit Court of Appeals of this circuit, while it has adopted the rule that a plaintiff who charges specific negligence may not have the benefit of the maxim regardless of what the evidence may show, has never gone so far as to hold that, where a plaintiff points out the specific defect in the instrumentality which caused his injury, and then charges that the existence of the defect was due to the negligence of the defendant generally, he will be deprived of the use of the maxim.

In Midland Valley R. Co. v. Conner, 217 F. 956 (C. C. A. 8), the allegations of the complaint were not set forth in the opinion, but it is stated that it contained five specific allegations of negligence.

In White v. Chicago Great Western R. Co., 246 F. 427 (C. C. A. 8), the allegations of negligence were specific. That is also true in Federal Electric Co., Inc., v. Taylor, 19 F.(2d) 122 (C. C. A. 8).

In Kaemmerling v. Athletic Mining & Smelting Co., 2 F.(2d) 574, 575 (C. C. A. 8) the allegations were:

"That when plaintiff took hold of said iron lever which hangs down between the posts for the purpose of transferring the current entering the property of the defendant company from low power to high power, he was severely shocked and burned. * * *

"That the injuries herein complained of resulted directly and proximately from the negligence of said defendants, its agents, servants, and employees, in a manner unknown and unexplained to this plaintiff."

These allegations of negligence were considered to be general.

In Bean v. Independent Torpedo Co., 4 F.(2d) 504, 505 (C. C. A. 8), the plaintiff assigned as negligence the failure to use reasonable care to provide the deceased with a safe place in which to work, and "in causing him to store nitroglycerine in one place in excess of 1,500 pounds, and in placing in such storeroom an open fire, as aforesaid, and by the failure on the part of the defendant to use reasonable care to provide the said Charles R. Van Dell with safe instrumentalities with which to work, and by failing to properly wash the nitroglycerine, as herein set out." The court remarked that the plaintiff did not rely on the res ipsa loquitur doctrine, but had set out the specific negligence charged, in which case the burden was upon him to establish such negligence.

In Dierks Lumber & Coal Co. v. Brown, 19 F.(2d) 732 (C. C. A. 8), the allegations were held to be general.

The Circuit Court of Appeals for the Sixth Circuit, in Pennsylvania Co. v. Clark, 266 F. 182, 184, held that, where the complaint charged negligence "(1) in causing and permitting the train to be wrecked; (2) in causing and permitting the boulder to be and remain upon the track; (3) in failing and neglecting to remove the obstruction from the track; (4) in failing and neglecting to make proper inspection of its track and roadbed to discover the obstruction thereupon," the maxim was applicable because the charges were general in two classes: "(1) Permitting the train to be wrecked; and (2) permitting the boulder to be on the track."

In the case of Chesapeake & Ohio Ry. Co. v. Smith, 42 F.(2d) 111 (C. C. A. 6), the complaint evidently alleged specific negli-

gence, but the majority opinion, which held the maxim applicable, did not refer to the allegation of negligence. (See dissenting opinion of Moorman, Circuit Judge.)

The question of whether an allegation of specific negligence precludes the plaintiff from invoking the maxim has apparently not been squarely decided by the Supreme Court, nor has that court determined what constitutes an allegation of specific negligence.

In the case of San Juan Light & Transit Co. v. Requena, 224 U. S. 89, 32 S. Ct. 399, 56 L. Ed. 680, the plaintiff sued to recover for the death of her husband, who was killed by an electric shock. The complaint read: "The plaintiff further says that the death of her said husband was caused by an attempt to adjust the electric light in the residence of her husband and herself, and that it occurred under the following circumstances, to-wit: That said light was stationary and fixed to the wall of the room in which plaintiff was sitting, and that to turn said light on or off, the person so engaged must turn the globe within which the electric wire is enclosed, and that when the deceased attempted to so adjust his light, he was stricken as herein set forth; and the plaintiff avers and charges the fact to be that the death of her husband in the manner and form in this complaint set forth, was wholly due to the gross neglect, or carelessness, or incompetency of the defendant, or its employees, in the construction, care, or maintenance of said wire for furnishing light; and plaintiff further says that she is informed and believes that because of said negligence or incompetency, and for no other reason, the death of her husband was brought about; and that the deceased did not contribute in any manner to said accident by any fault or negligence on his part."

Quoting from page 17 of the brief of the defendant in the Supreme Court: "In the case at bar the complaint specifically charged negligence in connection with the wire inside the electric light globe."

The plaintiff in her brief said (page 18): "Negligence, as charged against the plaintiff in error, is general, and no effort was made in the pleadings to aver, in detail, how the excessive volume of current managed to get on the residence wire of the decedent, except that it was through the negligence of the plaintiff in error, and this question of negligence was the main issue in the case."

And further (page 24): "It is deemed unnecessary to refer more in detail to the ingenuous argument of opposing counsel on this second assignment of error, constituting points I and II of their brief, except to say that they proceed upon the erroneous hypothesis that the negligence charged or involved in the case at bar is confined to the inside wiring of the residence of decedent, whereas the whole theory of the defendant in error, as plaintiff in the court below, was that the negligence of the plaintiff in error consisted in permitting an excess current to be transmitted from the electrical devices, wholly under the control of the plaintiff in error, onto the house wiring of said residence, and that this theory was also stated by the court in that part of his charge to the jury to which no exception was raised by plaintiff in error in the court below and on which no assignment of error is based."

The Supreme Court, in disposing of this issue, said (224 U. S. 96, 32 S. Ct. 399, 400, 56 L. Ed. 680): "It is urged that the negligence charged in the complaint related only to the condition of the wiring inside the residence of the deceased, and therefore that the court erred in permitting a recovery on the theory that the defendant was negligent in respect of the maintenance and care of the wires and converters outside. This contention must fail. While the complaint was not drafted with commendable precision, and, if critically examined, might be regarded as leaving it uncertain whether the negligence charged related to the wiring inside or to that outside, whereby the current was supplied, there was no objection to this uncertainty in the court below. On the contrary, the trial proceeded, as we have seen, upon the theory that the question whether the defendant had failed to exercise appropriate care in the maintenance and inspection of its outside wires and converters was within the issues. Each party, without objection from the other, introduced evidence bearing upon that question; and when it was submitted to the jury there was no exception upon the ground of a variance. Effect must therefore be given to the well-settled rule that where the parties, with the assent of the court, unite in trying a case on the theory that a particular matter is within the issues, that theory cannot be rejected when the case comes before an appellate court for review."

While that case is not decisive of the question here, it seems to indicate that the Supreme Court did not consider the form of the allegation of negligence important as bearing upon the applicability of the maxim res ipsa loquitur, but was concerned with the issues actually tried.

In no other case in the Supreme Court,

in which the maxim is involved or discussed, does there seem to be any reference to the form of pleadings having any bearing upon "res ipsa loquitur."

If the complaint in this case charged specific negligence, then, regardless of the issues litigated, under the rule in Missouri the maxim should not have been applied. In this connection, it is of some interest to note that there is much authority not in harmony with the Missouri rule. See Rosenzweig v. Hines, 280 F. 247 (D. C. W. D. N. Y.); Irvine v. D., L. & W. R. Co., 184 F. 664 (C. C. A. 3), where, while nothing was said as to the character of the allegations, they would necessarily, upon the standard of the Missouri cases, supra, be held to be specific; Pennsylvania Co. v. Clark, 266 F. 182 (C. C. A. 6), where, while the court considered the allegations of negligence as general, they appear to be far more specific than many of those termed specific in the Missouri decisions; Chesapeake & O. Ry. Co. v. Smith, 42 F.(2d) 111 (C. C. A. 6), where, while the majority say nothing as to the character of the allegations, Judge Moorman, dissenting, is of the opinion that they are specific in character; Lucid v. E. I. Du Pont de Nemours Powder Co., 199 F. 377, L. R. A. 1917E, 182 (C. C. A. 9); Southern Pacific Co. v. Hanlon, 9 F.(2d) 294 (C. C. A. 9). See, and compare the situations in: Biddle v. Riley, 118 Ark. 206, 176 S. W. 134, L. R. A. 1915F, 992; Colo. Springs & Int. R. Co. v. Reese, 69 Colo. 1, 169 P. 572; Firszt v. Capital Park Realty Co., 98 Conn. 627, 120 A. 300, 29 A. L. R. 17; Chicago City R. Co. v. Carroll, 206 Ill. 318, 68 N. E. 1087 (but compare O'Rourke v. Marshall Field & Co., 307 Ill. 197, 138 N. E. 625, 27 A. L. R. 1014); Rauch v. Des Moines Electric Co., 206 Iowa, 309, 313, 218 N. W. 340; Crozier v. Hawkeye Stages, Inc., 209 Iowa, 313, 228 N. W. 320 (but see Orr v. Des Moines Electric Light Co., 213 Iowa, 127, 238 N. W. 604); Hebert v. Lake Charles Ice, Light & Waterworks Co., 111 La. 522, 35 So. 731, 64 L. R. A. 101, 100 Am. St. Rep. 505; Chaisson v. Williams, 130 Me. 341, 156 A. 154; McDonough v. Boston Elev. R. Co., 208 Mass. 436, 94 N. E. 809; Eaton v. Consumers Power Co., 256 Mich. 549, 240 N. W. 24, where, while it is said res ipsa loquitur has no application in Michigan, a presumption of negligence was nevertheless allowed to rise; Kleinman v. Banner Laundry Co. et al., 150 Minn. 515, 186 N. W. 123, 23 A. L. R. 479; Bibeau v. Fred W. Pearce Corp., 173 Minn. 331, 217 N. W. 374; Trenton Pass. Ry. Co., Consolidated v. Cooper, 60 N. J. Law, 219,

37 A. 730, 38 L. R. A. 637, 64 Am. St. Rep. 592; Powell v. Hudson Valley R. Co., 88 App. Div. 133, 84 N. Y. S. 337; McNeill v. Durham & C. R. Co., 130 N. C. 256, 41 S. E. 383; Wyldes v. Patterson, 31 N. D. 282, 153 N. W. 630; Union Gas & Electric Co. v. Waldsmith, 31 Ohio App. 118, 166 N. E. 588; Boyd v. Portland Electric Co., 40 Or. 126, 66 P. 576, 57 L. R. A. 619; Sutton v. Southern Ry., 82 S. C. 345, 64 S. E. 401; Nashville Int. Ry. et al. v. Gregory, 137 Tenn. 422, 193 S. W. 1053; Dearden v. S. P., L A. & S. L. R. Co., 33 Utah, 147, 93 P. 271; Stewart v. Barre & Mont. P. & T. Co., 94 Vt. 398, 111 A. 526; Humphrey v. Twin State G. & E. Co., 100 Vt. 414, 139 A. 440, 56 A. L. R. 1011; Washington-Virginia R. Co. v. Bouknight, 113 Va. 696, 75 S. E. 1032, Ann. Cas. 1913E, 546; Appalachian Power Co. v. Hale, 133 Va. 416, 113 S. E. 711; Walters v. Seattle, R. & S. R. Co., 48 Wash. 233, 93 P. 419, 24 L. R. A. (N. S.) 788; Kluska v. Yeomans, 54 Wash. 465, 103 P. 819, 132 Am. St. Rep. 1121; Snyder v. Wheeling Electrical Co., 43 W. Va. 661, 28 S. E. 733, 39 L. R. A. 499, 64 Am. St. Rep. 922, where, however, the character of the allegation is doubtful.

Some of the courts have adopted the rule that, where specific negligence is pleaded, the plaintiff is not deprived of the inference of negligence arising because of the maxim, but the inference is limited to the negligence charged, and the defendant is required to exculpate himself only with respect to such negligence. This rule preserves to the plaintiff the benefit of the maxim, and relieves the defendant of the danger of being surprised at the trial. The logic of it is based upon the proposition that the whole is the sum of its parts—that, while in case of a charge of negligence generally one must show care in every particular, in case of a charge of specific negligence he need show only care with respect to the particular fault set up as a ground of recovery. Atkinson v. United Railroads of S. F., 71 Cal. App. 82, 234 P. 863; Queirolo v. Pac. Gas & Electric Co. (Cal. App.) 295 P. 882; St. Clair v. McAlister (Cal. App.) 8 P.(2d) 556; Palmer Brick Co. v. Chenall, 119 Ga. 837, 47 S. E. 329; Terre Haute & I. R. Co. v. Sheeks, 155 Ind. 74, 56 N. E. 434; Southern R. Co. v. Adams, 52 Ind. App. 322, 100 N. E. 773.

There appear to be but three states which strictly follow the rule in Missouri; namely, Kansas, Montana, and Texas. See Byland v. E. I. Du Pont de Nemours Powder Co., 93 Kan. 288, 144 P. 251, L. R. A. 1915F, 1000; Lyon v. Chicago, M. & St. P. R. Co. of Mon-

tana, 50 Mont. 532, 148 P. 386; Missouri, K. & T. R. Co. of Texas v. Thomas, 63 Tex. Civ. App. 312, 132 S. W. 974. Twenty states, as appears from previous citations, have definitely not followed the rule, and three have adopted the modified rule referred to above.

We are not concerned here with the correctness of the rule, but with its application. We assume, without deciding, that it is a rule relating to pleading and practice, which, under the provisions of the Conformity Act (section 724, title 28, USCA), we are bound to recognize and apply in this case. We hold, however, that the complaint charges only general negligence. The impropriety of holding otherwise is easily demonstrated. The plaintiff proved exactly what he alleged so far as the cause of the injury was concerned; namely, that his foot was caught in a space caused by the breaking of a tooth on the comb plate. Under the defendant's theory, if the plaintiff had not alleged that he was injured in that way, he could have had the benefit of the maxim by proving that he was, but, since he alleged the manner in which he was injured, and proved what he alleged, he cannot have the benefit of the maxim. A holding which would penalize a pleader for telling the truth and reward him for concealing it would be, to say the least, unsound.

3. A verdict may be directed by the court in a case where the maxim res ipsa loquitur applies. Dierks Lumber & Coal Co. v. Brown, supra; Gray v. Baltimore & O. R. Co., 24 F.(2d) 671, 59 A. L. R. 461 (C. C. A. 7); Rock v. Radice Electric Co., 131 Misc. 51, 225 N. Y. S. 659; Chesapeake & O. R. Co. v. Baker, 149 Va. 549, 140 S. E. 648 (but see same case, 149 Va. 549, 141 S. E. 753). The rule is, however, that the question of negligence is generally for the jury; and "it is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court." Grand Trunk Railway Co. v. Ives, 144 U. S. 408, 417, 12 S. Ct. 679, 683, 36 L. Ed. 485; Glynn v. Krippner, 60 F.(2d) 406, 407 (C. C. A. 8).

In a case of this kind, a verdict should only be directed when it can fairly be said that, taking into consideration all the evidence in the case, together with the inference or presumption which arises because of the application of the maxim, reasonable minds can reach only the conclusion that the defendant was not negligent. Had the defendant in this case introduced no testimony, the jury would have been justified in bringing in a verdict for the plaintiff. The credibility of the defendant's witnesses and the weight of their evidence was for the jury to determine. The jury saw the witnesses and heard them testify, and, while jurors may not disregard the testimony of unimpeached and credible witnesses, they are not required to believe things which to their minds seem unreasonable or improbable. The appearance of the defendant's witnesses and their relations to the defendant were matters which the jury might consider in determining the sufficiency of the defendant's explanation. It is conceivable that the jury may not have been impressed by the testimony of the defendant's witnesses. Possibly they did not believe that the attendant at the top of the escalator on the first floor kept her eye constantly on the teeth of the comb plate 40 feet away from her in the basement. It is conceivable that a reasonable man might believe that the exercise of the highest degree of care by one operating an escalator would require that the teeth of the comb plate be made out of such material, or be so attached, that they would not snap off or be sufficiently displaced, by either high heels or umbrellas, to permit the feet of passengers to become caught. One might, perhaps, believe that, since the point at which the belt entered the basement floor was the point of greatest danger, an attendant might be required at that point to prevent the happening of just such an accident as this.

We think, under all the circumstances, that the question whether the defendant had discharged its full duty to the plaintiff was for the jury.

4. The testimony with reference to the issue of damages, aside from that relating to the injuries to the foot and ankle, was this: The grandmother testified that Jimmie Bell's mother had suffered from tuberculosis for several months prior to the accident; that she had been in a sanitarium and had been brought home; that a room was built on the back part of the house, with a door from the kitchen and a door leading to the outside; that it did not connect with any other room in the house; that the room was built before the mother came home from the sanitarium; that it was some time before the accident; that the two children occupied a front room downstairs; that "it was very seldom they went in to see their mother; they didn't bother about her; they wanted to be out more than anything." She stated that, when Jimmie was brought home from the hospital after the accident, he stayed in the front room, about 36

feet removed from his mother, with a space of three rooms and a big hall between them; that he went back to the hospital and was gone six weeks or two months and did not come back until June; that his mother died in May; that he was home just three weeks before he went to the hospital the second time; that he was in bed in his room all that time, and the mother was in bed in her room, so that she did not see him.

Dr. Boislinier, on behalf of the plaintiff, testified that in December, 1929, he made a complete examination of Jimmie, and found that he had tuberculosis. With reference to the question as to whether the accident had anything to do with Jimmie's tubercular condition, he had this to say: "Having in mind this sort of hypothesis: That this boy, on April 5, 1928, was in a department store in St. Louis and had his foot mashed to the extent that there were open wounds on it, dirt upon it, bleeding from it; that he was removed to a hospital; that he lost weight that was very noticeable, and it was at least eight pounds, when he came out of the hospital; that he had to have a blood transfusion while in the hospital; I would say that that sort of a trauma, with that character of open wound and the attendant loss of weight, was something that would be calculated to markedly lower his resistance. A markedly lower resistance has something to do with lessening immunity to tuberculosis. We all have a sort of natural resistance, and if the boy were to come in contact with only a very few tuberculosis germs he might possibly resist those, or if he had had any previous infection, if he had been infected before this accident, then that might definitely render those tuberculous deposits in his lungs very much more of a menace."

On cross-examination, he stated, among other things, that a child who has contact with a tubercular parent is very likely to acquire tuberculosis if there is tuberculosis bacilli in his mother's sputum and if it is an open case; that whether it is likely that the boy could have acquired in his sputum the germs of tuberculosis in the contact that he had with his mother during the months that he was there with her in the house, after she came from the sanitarium, depends entirely upon how careful they were. He stated that it is difficult, in a child, to determine merely by the stethoscope the presence of the germs of tuberculosis; and that recent investigations tended to show that a very high percentage of children who have contacts with infected parents are really tubercular, even though they manifest a healthy appearance. He also said that he could not tell anything about when the boy acquired his potential tuberculosis, that he (the doctor) would probably attribute it to some association with his mother or somebody else, but that the history of the case is such that it would be natural to attribute it to the mother. He stated that he saw no signs of active tuberculosis at the time of the trial, but that the boy's blood still showed he was below par in resistance.

Dr. B. F. Striegel, called by the plaintiff, testified that he had examined the boy four or five weeks prior to the accident; that he had examined his chest and lungs with a stethoscope, but found no evidence of tuberculosis; that he knew that the mother was suffering from tuberculosis, and the examination he made was to keep in touch with whether or not the children were becoming infected.

Dr. Bell, who testified on behalf of the defendant, said that it was difficult to determine by stethoscope whether a child had tuberculosis; that tuberculosis is a communicable disease and is not inherited; that the chance of children acquiring tuberculosis as the result of contacts with parents who are diseased is a very great one; that children are very much more susceptible to tuberculosis than adults; that, where a child had contact with a tubercular parent, who died a year and a half before any manifestation or information was obtained with reference to the child's having tuberculosis, the infection could have originated from contact with the mother a year and a half before any manifestation of disease.

It will be noted that none of the physicians who testified stated that it was his opinion that Jimmie Bell acquired tuberculosis as a result of this accident, or that he would not have had tuberculosis had this accident not occurred. The most that can be said is that the plaintiff's physicians expressed the opinion that the child was more susceptible to tuberculosis after the accident, because of lowered resistance, than he was before the accident, and that it was possible that it was the lowered resistance which caused him to contract the disease.

The rule as to damages was stated by this court in Central Coal & Coke Co. et al. v. Hartman, 111 F. 96, 98, as follows: "Actual damages only may be secured. Those that are speculative, remote, uncertain, may not form the basis of a lawful judgment. The actual

damages which will sustain a judgment must be established, not by conjectures or unwarranted estimates of witnesses, but by facts from which their existence is logically and legally inferable. The speculations, guesses, estimates of witnesses, form no better basis of recovery than the speculations of the jury themselves. Facts must be proved, data must be given which form a rational basis for a reasonably correct estimate of the nature of the legal injury and of the amount of the damages which resulted from it, before a judgment of recovery can be lawfully rendered. These are fundamental principles of the law of damages."

In Virginia & S. W. R. Co. v. Hawk, 160 F. 348, 352 (C. C. A. 6), the court said: "But a case should never be left to a jury simply on a question of probabilities with a direction to find in accordance with the greater probability. Probabilities may help out items of evidence from which an inference can be drawn, but cannot take their place. To allow a jury to dispose of a case simply upon a weighing of probabilities is to turn them loose into the field of conjecture, and to have the rights of the parties determined by guess."

See, also, Western Union Tel. Co. v. Ivy, 177 F. 63 (C. C. A. 8); Macaw v. Oregon Short Line R. Co., 49 Idaho, 151, 286 P. 606; Johnston v. City of Galva, 316 Ill. 598, 147 N. E. 453, 38 A. L. R. 1384; Trapnell v. City of Red Oak Junction, 76 Iowa 744, 39 N. W. 884; Posch v. Payne, 151 Minn. 111, 186 N. W. 132; Moss v. Phila. R. T. Co., 42 Pa. Super. Ct. 466; Anton v. C., M. & St. P. R. Co., 92 Wash. 305, 159 P. 115; Frickel v. Lancaster County, 115 Neb. 506, 213 N. W. 826; Rice v. Norfolk So. R. Co., 174 N. C. 268, 93 S. E. 774; McCrosson v. Phila. R. T. Co., 283 Pa. 492, 129 A. 568; Gulf, C. & S. F. R. Co. v. Young (Tex. Civ. App.) 284 S. W. 664; Slack v. Joyce, 163 Wis. 567, 158 N. W. 310.

■ The burden of establishing the nature and extent of his injuries resulting from the accident was upon the plaintiff, and evidence that is consistent with an hypothesis that he contracted tuberculosis as a result of the accident and also with an hypothesis that he did not, tends to establish neither. Eggen v. United States, 58 F.(2d) 616, 620 (C. C. A. 8); Gunning v. Cooley, 281 U. S. 90, 94, 50 S. Ct. 231, 74 L. Ed. 720.

■ We therefore reach the conclusion that, so far as the issue of liability is concerned, it was properly determined, but that, so far as the issue of damages is concerned, there was error in permitting the jury to consider the question of whether the plaintiff acquired tuberculosis as a result of the accident.

■ The question then arises whether this case shall be remanded for a new trial upon both issues.

The issues are separate and distinct. It seems unjust that the plaintiff should be required to retry the issue of liability because of an erroneous instruction as to an item of damages. The finding of the jury should have put the question of liability at rest.

At common law, a separation of issues and the remanding of a single issue was not allowed. Some courts still hold that it is not permissible. Krummen Motor Bus & Taxi Co. v. Mechanics' Lumber Co., 175 Ark. 750, 300 S. W. 389; McKeon v. Central Stamping Co., 264 F. 385 (C. C. A. 3).

The Supreme Court, however, has held that a new trial may be granted, restricted to the issue of damages. The question first arose in Norfolk Southern R. Co. v. Ferebee, 238 U. S. 269, 35 S. Ct. 781, 59 L. Ed. 1303, where such separation was hesitatingly allowed; and again appeared in Gasoline Products Co., Inc., v. Champlin Refining Co., 283 U. S. 494, 51 S. Ct. 513, 75 L. Ed. 1188. In the latter case it was contended that the granting of a new trial upon a single issue violated the Seventh Amendment. The court said (page 497 of 283 U. S., 51 S. Ct. 513, 514): "It is true that at common law there was no practice of setting aside a verdict in part. If the verdict was erroneous with respect to any issue, a new trial was directed as to all. This continued to be the rule in some states after the adoption of the Constitution; but in many it has not been followed, notwithstanding the presence in their Constitutions of provisions preserving trial by jury."

And, on page 499 of 283 U. S., 51 S. Ct. 513, 515: "Here we hold that, where the requirement of a jury trial has been satisfied by a verdict according to law upon one issue of fact, that requirement does not compel a new trial of that issue even though another and separable issue must be tried again. As the issues arising upon petitioner's cause of action on the royalty contract are clearly separable from all others and the verdict as to them already given is free from error, it need not be disturbed. But the question remains whether the issue of damages is so distinct and independent of the others, arising on the counterclaim, that it can be separately tried."

In Simmons v. Fish, 210 Mass. 563; 568, 97 N. E. 102, 104, Ann. Cas. 1912D, 588, the court said:

"The guiding principle is that, although a verdict ought not to stand which is tainted with illegality, there ought to be but one fair trial upon any issue, and that parties ought not to be compelled to try anew a question once disposed of by a decision against which no illegality can be shown. * * *

"If it [the court] is convinced upon a review of the whole case that the jury have settled the issue of liability fairly and upon sufficient evidence, so that dissociated from other questions it ought to stand as the final adjudication of the rights of the parties, and that there has been such gross error in the determination of damages as requires the setting aside of the verdict, that court has the power to do so, and confine a new trial to damages alone. It is a power which ought to be exercised with great caution, with a careful regard to the rights of both parties, and only in those infrequent cases where it is certain and plain that the error which has crept into one element of the verdict by no means can have affected its other elements. But when a proper occasion clearly exists, it is in the interests of justice to exercise the power."

In Perkins v. Brown, 132 Tenn. 294, 177 S. W. 1158, 1160, L. R. A. 1915F, 723, Ann. Cas. 1917A, 124, the court said: "If it is to the interest of the state that there should be an end to litigation, the courts should not be slow to adopt this rule that looks to the preventing of further contest on phases of litigation or issues already well settled, the saving to litigants the costs incident to the relitigation of such matters, and to the courts the time unnecessarily consumed therein."

The limiting of a retrial to a single issue where other issues have been properly submitted and determined has been approved by the First Circuit in Farrar v. Wheeler, 145 F. 482, by the Fourth Circuit in Schuerholz v. Roach, 58 F.(2d) 32, by the Fifth Circuit in Thorpe v. Nat. City Bank of Tampa, 274 F. 200, and by the Ninth Circuit in Twenty-one Mining Co. v. Original Sixteen to One Mine, 265 F. 469. See, also, Pretzer v. Calif. Transit Co., 211 Cal. 202, 294 P. 382; McCarty-Johnson H. & E. Co. v. Frankel, 70 Colo. 330, 201 P. 36; Simmons v. Fish, supra; Morton v. Griggs, Cooper & Co., 162 Minn. 436, 203 N. W. 218; Lundblad v. Erickson, 180 Minn. 185, 230 N. W. 473; Sussman, Wormser & Co. v. Sea Food Co., 130 Miss. 632, 94 So. 795; Barr v. Nafziger Baking Co., 328 Mo. 423, 41 S.W.(2d) 559; Miller v. Nultemeier, 56 N. D. 347, 217 N. W. 515; Placella v. Robbio, 47 R. I. 180, 131 A. 647; Parizo v. Wilson, 101 Vt. 514, 144 A. 856; Howell v. Murdock, 156 Va. 669, 158 S. E. 886.

While the question has apparently not arisen in this circuit, there can be no doubt of the right of this court, in an appropriate case, to restrict a new trial solely to a single issue which is separate and distinct from all other issues, when it appears that the error which requires the new trial of that issue did not in any way affect the determination of any other issue.

In this case, the instruction of the court which permitted the jury to enhance the amount of the verdict if it found that the plaintiff's tubercular condition was a result of the injuries to his foot could not have affected the jury's determination of the question of liability. A correct instruction as to damages might have resulted in a smaller verdict in favor of the plaintiff, but it could have had no other effect.

The judgment is reversed, and the case remanded, with directions to set aside the verdict in so far as it constitutes a determination of the amount of damages the plaintiff is entitled to recover, and to grant a new trial upon the issue of damages.

The costs of appeal will be divided equally between the parties.