## GRAY v. BALTIMORE & O. R. CO.

Circuit Court of Appeals, Seventh Circuit. March 5, 1928.

No. 3888.

1. Negligence ⟨⟩108(1)—Plaintiff must by proper averments disclose his cause of action, regardless of maxim "res ipsa loquitur."

Rules of pleading require that plaintiff must by proper averments disclose his cause of action, and maxim "res ipsa loquitur" has no relation to and in no way affects such rule.

2. Pleading ⟨⟩52(1)—Plaintiff may state case in as many ways as he sees fit in separate counts.

Plaintiff may state his cause of action in as many ways as he sees fit in separate counts.

3. Negligence ⟨⟩121(2)—Where negligent act is known, maxim "res ipsa loquitur" is inapplicable.

Where act of negligence is known, maxim "res ipsa loquitur" does not apply.

4. Negligence ⟨⟩136(12)—Where maxim "res ipsa loquitur" applies, whether case is for jury depends on facts.

Where maxim "res ipsa loquitur" applies, question as to whether case should be submit-

ted to jury is one to be determined on facts in each case.

**5. Carriers ⬡⇒295(1)—Railroad engineer must exercise highest degree of care practical in operating train.**

Railroad engineer has duty to exercise highest degree of care practical in operation of train.

**6. Carriers ⬡⇒301—Engineer held as matter of law not negligent in running train through switch opened by tramp, causing injury to passenger.**

In action by passenger against railroad for injuries when train ran through switch opened by tramp, evidence as to negligence of engineer *held* insufficient to take such question to jury.

**7. Evidence ⬡⇒67(1)—In determining engineer's negligence in running through open switch, it cannot be presumed that switch light could have been seen as far at 10:47 p. m. as it could an hour before.**

For purpose of establishing negligence of engineer in action by railroad passenger for injuries when train ran through switch opened by tramp, it cannot be presumed that one could see switch light as far at 10:47 p. m., when accident occurred, as at 9:30 p. m., when freight train left switch.

In Error to the District Court of the United States for the Eastern District of Illinois.

Action by James Gray against the Baltimore & Ohio Railroad Company. Judgment for defendant, and plaintiff brings error. Affirmed.

James G. Burnside, of Vandalia, Ill., for plaintiff in error.

Rudulph J. Kramer, of East St. Louis, Ill., for defendant in error.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

PAGE, Circuit Judge. Plaintiff in error (plaintiff), a passenger on defendant's train, was injured when the train of eleven cars ran into an open switch 1¼ miles west of the town of Aviston, Ill., at 10:47 on the night of October 3, 1924. About 9:30 that evening a freight train passed through that switch, going west. The switch was properly closed and locked behind the freight train, and had burning upon its standard the usual oil-burning lamp, which showed green down the main track when the switch was closed and red when it was open. The freight crew saw near the switch a negro tramp, with something in a bag or package, and a small crowbar over his shoulder. Later the negro sawed through the switch lock and opened the switch.

It is admitted that the switch light was out before the wreck occurred. There were on the switch standard blades or banners, painted green on one side and red on the other. When the switch was open, the red could be seen down the main line not over 250 feet; the kind of night having a good deal to do with it. Further facts will appear in the discussion.

The first count of the declaration avers that defendant so negligently drove and propelled its locomotive that the train, including the car in which plaintiff was a passenger, was derailed.

The second count avers that defendant negligently failed to keep and maintain a light on the switch, and by its agents in charge of the train, as it approached the switch, wholly failed to observe that the light on the switch did not indicate that the switch was closed, but that it then and there negligently and carelessly operated the train, so that the train was run into the switch at a high rate of speed, without stopping to examine the switch.

The third count charges that, after having seen the negro in the vicinity of the switch, it was defendant's duty to have placed a guard on the switch, or to notify the persons in possession of the passenger train of threatened danger, etc. It is not urged that there is evidence to support this third count.

The court directed a verdict for defendant, and that is the basis for the only assignment of error relied on.

Plaintiff's first proposition is that, as it is admitted that he was a passenger on defendant's train, and was injured when the train was derailed, there arose therefrom a presumption that the injury was caused by defendant's negligence, and that the law required the court to submit the case to the jury.

There has been, in both the state and federal courts, a wide range of discussion of the maxim "res ipsa loquitur." What the maxim means, when it is applicable; whether, if applicable, the burden of proof shifts to the defendant; whether, if applicable, the case must go to the jury; whether, if special acts of negligence are alleged, the maxim applies—are all questions that have been many times discussed and decided in different ways. In many of the cases, it is not shown what issues were made by the pleadings.

In Sweeney v. Erving, 228 U. S. 233, 238, 33 S. Ct. 416, 418 (57 L. Ed. 815, Ann. Cas. 1914D, 905), the court said: "Res ipsa loquitur means that the facts of the occurrence warrant the inference of negligence."

In Francey v. Rutland, 222 N. Y. 482, 119 N. E. 86, the court said the inference is drawn, "because all of the circumstances surrounding the accident are of such a character that, unless an explanation be given, the only fair and reasonable conclusion is that the accident was due to some omission of defendant's duty." Cited in Central R. Co. v. Peluso, 286 F. 661, 663 (2d C. C. A.).

[1, 2] The maxim "res ipsa loquitur" has no relation to, and in no way affects, the rule that plaintiff is required by averments to disclose the cause of action relied on. He may state his case in as many ways as he sees fit in separate counts. If a count alleges specific acts of negligence, plaintiff may support that count by any competent evidence tending to show those acts. If the charge of negligence is so general that it will be sustained by showing facts to which the maxim "res ipsa loquitur" will apply, such facts may be shown.

There is not in this case a general charge of negligence in the construction or maintenance of the railroad, or of any of the equipment or appliances. The first count is based upon the negligent operation of the locomotive. While the allegation is not specific as to the negligence, yet it is so far specific that it is limited to the handling of the locomotive. No reference is made to the open switch. The second count is a specific allegation that those in charge of the locomotive failed to see that the switch light was out and stop the train before it went into the open switch. The case was tried, and argued here, upon the theory that the engineer was negligent in not seeing that the light was out, and in not stopping the train before he reached the switch.

[3] We are of opinion that the maxim "res ipsa loquitur" has no application in this case. Negligence is never presumed. Under the maxim "res ipsa loquitur," negligence is only inferred from the surrounding circumstances in those cases where the act of negligence is not known. If the negligence is known, there is no justification for the drawing of inferences. In this case, the cause of the open switch was a matter of common knowledge, and was fully known to the plaintiff. The switch was found open into the siding. The derailing of the cars was caused by the derailing device, properly in place upon the switch rails. The sawed lock was found soon after the accident near the switch. The negro was apprehended, convicted, and sent to prison, because he sawed the lock and opened the switch. The plaintiff in no way challenges those facts, but, on

the contrary, he bases his third count upon the failure of defendant to guard the switch against the negro. The switch was taken under the control of the negro at the time he sawed the lock, and from that time until the wreck it cannot be said that it was solely under the control of the defendant.

Whether the engineer was negligent in any particular as charged presented a question of fact, that could in no way be presumed from the fact that the accident happened. But assuming, for the sake of the argument, that the maxim does apply, was it error for that reason to take the case from the jury? The negligence of the engineer will be later considered.

In the Sweeney Case, supra, the court said that, when res ipsa loquitur applies, "it has not the effect of shifting the burden of proof." And again:

"In our opinion, res ipsa loquitur means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. Res ipsa loquitur, where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is, whether the preponderance is with the plaintiff."

Taken in connection with the whole paragraph quoted, we understand that, in using the words "that they make a case to be decided by the jury," the court meant that, unexplained, the facts made a case for the jury. Otherwise, that clause would be inconsistent with those other clauses, "it is evidence to be weighed, not necessarily to be accepted as sufficient," and "they call for explanation or rebuttal, not necessarily that they require it."

If we should hold, under the facts in this case, that on the theory of res ipsa loquitur the case must go to the jury, such a holding would not be in harmony with Small v. Lamborn, 267 U. S. 248, 45 S. Ct. 300, 69 L. Ed. 597, where the court restated a well-known rule:

"The rule for testing the direction of a verdict, as often has been held, is that where the evidence is undisputed, or of such conclusive character that if a verdict were returned for one party, whether plaintiff or

24 F.(2d)—43

defendant, it would have to be set aside in the exercise of a sound judicial discretion, a verdict may and should be directed for the other party."

If the case, without reference to the negligence of the engineer, had been submitted to the jury, it unquestionably would have been the duty of the court to set aside any verdict in favor of the plaintiff. In Dierks Lumber Co. v. Brown, 19 F.(2d) 732, 735 (8th C. C. A.), the court, speaking of the maxim res ipsa loquitur, said:

"This rule does not relieve the plaintiff from the burden of showing negligence. * * * The presumption arising from the circumstances may be sufficient to take the case to the jury, unless the entire evidence is such that the presumption cannot stand against it."

[4] We are of opinion that, where the maxim "res ipsa loquitur" applies, the question as to whether the case should be submitted to the jury is one to be determined upon the facts in each case.

[5, 6] It is urged by plaintiff that the evidence shows negligence of the engineer with sufficient certainty to make a jury case on that issue. In this connection, it is urged that the court erred in not admitting in evidence defendant's operating rule 27:

"A signal imperfectly displayed, or the absence of a signal at a place where a signal is usually shown will be regarded as the most restrictive indication that can be given by that signal, and the fact reported to the train dispatcher. Conductors and enginemen, observing any switch light imperfectly displayed, or absent, while at a station or siding, will, if practicable, correct or replace the light."

No error is assigned, but whether the rule was wrongfully excluded we deem unimportant, because there is no evidence that the engineer either ignored or disobeyed the rule. We are also of opinion that that rule does not adequately express the high degree of care required of engineers by the law. The law imposed upon the company, and that duty was upon the engineer, to exercise the highest degree of care practical in the operation of that train, and the question is: Does the evidence show negligence on his part that required the case to be submitted to the jury?

The substance of plaintiff's claim is that the evidence shows that the engineer failed to stop his train within half a mile, when it could have been done in 800 or 1,000 feet. The lowest speed of the train shown was 50 miles per hour; so that it covered 73 feet in one second and one-half mile in 36 seconds. One and one-quarter miles east of the open switch was the small town of Aviston. Whether it was lighted in any way does not appear. Sugar Creek bridge was west of the switch, as testified by a witness, "I judge about half a mile." It is not more definitely located, and whether it was a large or small bridge, or whether it was in any sense a landmark, does not appear. The derailment occurred at 10:47, and the switch light was then out. Whether there were any lights east of Sugar Creek bridge, that could be seen from that vicinity, does not appear. There was to be no stop at Aviston.

A former engineer, Lager, said that the light was placed upon the switch to show the position of the switch, and probably he might have added that the light was placed there to show whether the switch was open or closed. There is no claim that the engineer could have stopped the train after he got close enough to see the banners or blades on the switch standard.

The question as to how far the switch light could be seen enters largely into the discussion. Lager said, "I judge you could see it for half a mile." The head brakeman on the freight train, which passed through the switch an hour and a quarter before the wreck, said that from the front end of the train, which was about 2,000 feet long, he saw the switch light after the switch had been closed by the rear brakeman. The rear brakeman testified that he stood on the rear of the train and saw the light for probably half a mile. All witnesses questioned on that point said that the distance which the light could be seen would depend upon the weather conditions prevailing at the time. The negro who cut the switch testified that it was "a kinda stormy night." Plaintiff said that, when he got out of the car, "it kind of sprinkled rain a little bit, very little." His son testified:

"It was very dark, in the first place; you could just see the lights in the coaches; the lights stayed on; the cars all piled up; we stumbled around until I could find my father and mother."

Whether the weather conditions were the same when the freight train went west as they were when the wreck occurred, 1¼ hours later, does not appear.

[7] For the purpose of establishing the negligence of the engineer, we do not think that it can be presumed that one could or could not see a light as far at 10:47 as at 9:30. But, if it be assumed that one could, then the strongest evidence of the distance at

which the light could be seen would be "probably half a mile."

Plaintiff places great stress upon the statement of the fireman of the wrecked train, Purcell, that the train could have been stopped within a distance of 800 to 1,000 feet. To get the value of that evidence, we will quote a part of the fireman's testimony on cross-examination, wherein it was brought out:

"Q. Couldn't you stop that train in a quarter of a mile? Couldn't a competent and skillful engineer stop that train in a quarter of a mile? A. No.

"Q. How far would be required to stop that train going 50 miles an hour? A. Between 800 and 1,000 feet.

"Q. How far is a quarter of a mile; that is more than 800 or 1,000 feet either, isn't it? (Witness does not answer.)

"Q. You say you could stop that train in 800 or 1,000 feet? A. I judge that would be according to the handling of the train; I am just saying my judgment about this."

It then appeared that he had been a fireman, and had run over that piece of track for about 11 years. He was then asked:

"Q. Your opinion is that that train, running at approximately the rate of 50 miles an hour, it would take 800 to 1,000 feet to stop it after applying the brakes? A. I said that he applied the brakes about a quarter of a mile from that switch; I said about that distance. What is a quarter of a mile? About a quarter of a mile is my way of saying it.

"Q. A quarter of a mile is 1,760 feet, isn't it? A. I don't know how far it is; I said somewhere along in there."

It is quite evident from this that the witness was very uncertain about the distance within which such a train could be stopped, and also as to the number of feet in a quarter of a mile. Whether his confusion and his testimony were aided by the misleading suggestion of plaintiff's counsel that a quarter of a mile was 1,760 feet does not appear. But the evidence, at its best, could have but very little weight.

Plaintiff's argument assumes that the engineer was bound to know where the switch light was, and also that he was bound to know, almost on the second, where the switch stand was, even without any light upon it. The only way the engineer could have known what switch light it was, had the light been burning, was from its relation or position with reference to other known objects. Whether the train was on time on that night does not appear. Whether there was any time scheduled for its passing Aviston, or whether it passed Aviston at the same time every night, are matters that do not appear; so it cannot be said that the engineer should have known, on that account, when he came to the switch because of its proximity to Aviston.

The only other object in the vicinity of the switch to which reference is made is Sugar Creek bridge. Was the engineer bound to know when the train passed that bridge, or was it negligence not to know? As we have seen, there is nothing in the evidence to show the size or importance of the bridge. Whether there were a great many other bridges upon that run, or whether there were other similar bridges in that vicinity, does not appear. The bridge is not located with reference to any other thing, except the light on the switch and the town of Aviston, nearly two miles away. That night the light was not upon the switch, and there was no evidence from what point Aviston could be seen.

We are of opinion that if the engineer did not know that night when he passed Sugar Creek bridge, it was not evidence of negligence.

Doubtless there were many switch lights upon the road. If it can be said that the engineer was bound to know the location of that switch light, may it not be said that he was bound to know the location of every such light upon the road? The former engineer, Lager, said that the light was placed upon the switch for the purpose of locating the switch. That would seem to indicate that there was a necessity for it for that purpose, and that if the light was not there the switch could not be so readily located. In any event, it is quite a different proposition to say that the engineer was bound to know where the switch was if the light was upon it, and to say that he was bound to know where it was, or to locate it within a few seconds, if there was no light upon it.

The engineer had at most but a few seconds in which to act. The length of time that it would take to shut off the steam and apply the brakes, so as to make them effective to stop the train within a specified distance, is not shown. Whatever may be said as to what the engineer was bound to know about the location of the switch with the light on it, under favorable atmospheric conditions, he had a different question to settle; atmospheric conditions were bad, and there was in fact no light. Certainly some time must be allowed for the engineer to determine whether there was no light there, or

whether he could not see it because of atmospheric conditions. It is not, and cannot be successfully, contended that the light was out because of the negligence of the defendant.

The fireman, Purcell, testified as to what he saw and did, and as to what the engineer did. He said: "I put in a fire quite a little ways back from the switch; about the time I completed my fire I sat down on my seat; that would be about a quarter of a mile from the switch; just about the time I got settled down the wreck occurred." He says he did not notice the switch, "because after a man puts in a fire the glare affects his vision for a while." He said that Vanollen, the engineer, as he approached the switch, applied his brake; that "just about the time I got on my side, about a quarter of a mile, I seen him apply his brake"; and that before the wreck he had diminished the speed of the train.

Then followed the confusion about the length of a quarter of a mile and the time it would take to stop the train. He was asked to tell the jury how close they were to the switch when he first noticed the application of the brakes, and answered: "It would not be very long—just an instant. I seen Vanollen stand and apply the brakes, but how far that was would be beyond my knowing, in the dark; it was dark and had been raining; just to tell how far we were from the switch, I couldn't do that."

The engineer did not testify, for, after he applied the brakes, the train was wrecked at the switch, and he was instantly killed. That he was a competent, capable, and careful engineer of large experience is not questioned. We find no evidence in the record from which his negligence may be presumed, or that would require that the case be submitted to the jury.

The judgment of the court should be and is affirmed.