## THE MATERIAL SERVICE.

### In re LEATHEM SMITH-PUTNAM NAVIGATION CO.

### No. 41349.

District Court, N. D. Illinois, E. D.

June 7, 1934.

Lord, Lloyd & Bissell and Curt H. G. Heinfelden, all of Chicago, Ill., for plaintiff.

Kremer, Branand & Hayes and Edward B. Hayes, all of Chicago, Ill., for respondents.

WOODWARD, District Judge.

This is a petition for limitation of liability under sections 4283, 4284, and 4285 of the Revised Statutes of the United States (46 USCA §§ 183, 184, 185).

About 9 o'clock a. m. on November 30, 1930, a violent explosion occurred on the motor vessel Material Service, owned by libelant and petitioner, Leathem Smith-Putnam Navigation Company, a corporation,

while proceeding on the Sanitary Canal loaded with a cargo of gravel. As a result of the explosion the cook, Charles Embury, was so badly burned that he died five days later, and various members of the crew of the Material Service suffered injuries not so severe. One Delia Embury, who was on board the vessel with the consent and at the invitation of the captain, also suffered injuries.

Five actions at law were instituted against libelant and petitioner in the superior court of Cook county, Ill., for loss of life, personal injuries, and other damages and injuries resulting from the explosion. Thereupon libelants filed their petition for limitation of liability in this court, and, as a result thereof, an order was entered by Judge Carpenter enjoining the plaintiffs from proceeding with the suits in the superior court. In answer to the petition of libelants, the respondents filed a joint answer setting out their theory of how the explosion occurred. After filing the joint answer, an application was made to Judge Carpenter for a modification of the injunction theretofore entered in this cause so as to permit respondents to prosecute their respective actions for damages against libelants in the superior court of Cook county, Ill. The application for the modification of the injunction order was denied by Judge Carpenter.

A hearing was had on the libels and the joint answer of the respondents lasting several days, at which hearing extensive testimony was taken bearing upon the cause of the explosion. At the conclusion of this hearing respondents again moved the court to modify and alter the injunction heretofore issued by Judge Carpenter so as to permit the prosecution of their action for damages against libelants in the superior court of Cook county, Ill.

The pending motion is urged principally on the ground that the agreed valuation of the vessel in question is $200,000, while the claims actually filed amount to $175,000. Judge Carpenter decided that while the claims filed would not equal or exceed the agreed valuation of the boat, there was at the time of the filing of the petition a possibility of other claims. Judge Carpenter's holding, therefore, became the law of this case. It is well settled that a judge may not overrule a prior decision of another judge of the same court in the same case. Columbia Chemi-

cal Co. v. Duff (C. C. A.) 184 F. 876; Town of Fletcher v. Hickman (C. C. A.) 208 F. 118; Plattner Implement Co. v. International Harvester Co. (C. C. A.) 133 F. 376; Commercial Union v. Anglo-South American Bank (C. C. A.) 10 F.(2d) 937; Jurgenson v. National Oil & Supply Co. (C. C. A.) 63 F.(2d) 727; Hardy v. North Butte Mining Co. (C. C. A.) 22 F.(2d) 62. There has been no essential change in the record since Judge Carpenter issued the injunction and refused to modify it. The court, therefore, denies the motion to modify the injunction.

In their joint answer respondents charge:

(1) That by reason of the fault and negligence of the agents and servants of libelant, dangerous and explosive gases and fumes were permitted to accumulate in the steering gear room of the Material Service, which gases and fumes ignited, causing the explosion and damage complained of; and

(2) The death of Charles Embury and the damages and injuries personally sustained by the other respondents were caused by the fault and neglect of libelant and without any fault or negligence on the part of the respondents or of any of them.

The Material Service is a steel, Diesel-propelled motor vessel, 240 feet in length, 40 feet in beam, 15 feet in molded depth, of 1,077 tons gross and 736 tons net register. She was used for carrying cargoes of sand, gravel, and like commodities principally upon the lower waters of Lake Michigan, the Chicago river, and Sanitary Canal.

The Material Service was equipped for carrying sand, gravel, and like commodities.

The after part of the vessel contained the steering gear room, the galley, and the crew's mess and quarters on the port side and on the starboard side the officers' quarters. The officers' dining room was between the galley and the captain's quarters. The entry to the pilot house was forward of the officers' dining room. The galley had in one corner oil stoves, and at the end on one side of the entrance from the galley to the steering gear room a sink, and on the other side an ice box, the sink and ice box being against the bulkhead between the steering gear room and the galley. The crew's mess was forward of the galley. There was an opening in the wall or partition separating the galley from the

crew's mess through which food and dishes were passed.

In the officers' dining room there was a manhole leading into the afterpeak tank and a heavy iron plate to cover it.

A number of ballast tanks were located below the main deck. Those in the forward part of the boat were filled with water when the boat was running light and emptied while cargo was being taken on. The afterpeak tank was a ballast tank situated at the after end of the boat. It extended beneath the steering gear room, the galley, the officers' dining room and the captain's quarters. It contained, when filled to operating capacity, 30 short tons or 60,000 pounds of water. The afterpeak tank was kept filled at all times with this amount of water in order to hold down the back end of the boat when the boat was loaded (the cargo being carried forward), and to keep the boat low in the water when she was not loaded, in order that she might pass under the bridges in the Chicago river and in the Drainage Canal.

Immediately in front of the forward wall of the afterpeak tank was the oil-fired heating boiler, which was about 12 feet long and 4 feet in diameter. In front of the heating boiler were two Diesel engines, each with six cylinders and each of 350 H. P. The exhaust from the Diesel engines passed through the afterpeak tank and thence up through the steering gear room, and thence out into the open air. Two mufflers on the exhaust were in the steering gear room.

The steering gear room occupied the back end of the vessel. It was approximately 40 feet long and about 8 feet wide. Its rear wall or after wall was curved with the after portion of the vessel. A steel bulkhead, securely riveted both at the top and at the bottom, formed the forward wall of the steering gear room. In the steering gear room were a fresh-water tank, a water circulating pump, a smokestack from the oil-fired heating boiler, the steering engine, two mufflers for the exhaust from the two Diesel engines, an electric machine or motor for cooling the refrigerator in the galley, and a fuel tank for the galley range. The exhaust from the Diesel engines came into one pipe through the afterpeak tank and, in the steering gear room, split into two pipes in the form of a Y. There were no gaskets at the flanges of the exhaust pipe.

The motor which was used in connection with the electric refrigerator in the galley emitted, from time to time, electric sparks and flashes.

The afterpeak had for ventilation two gooseneck vents, each four inches in diameter. Both of these led into the steering gear room and terminated there, the same not being led out into the open air prior to the explosion.

In the ceiling of the steering gear room were two manholes covered with scuttles. In the back room were two portholes and a chock. In the forward wall was a door leading into the galley. This door was in two parts, with a flange over the upper part of the door to hold the lower part shut. It was closed on the galley side by a knob and lever.

The explosion occurred between 9 and 9:30 o'clock of the morning of November 30, 1930. The two manholes in the ceiling of the steering gear room were covered with steel scuttles. These scuttles were closed the night before and continued closed until the explosion, both being blown off by the force of the explosion. At the time of the explosion both portholes in the steering gear room were closed. The preponderance of evidence also shows that the chock was closed with a watertight cover. The door from the steering gear room into the galley was closed at about 4:30 o'clock in the morning and probably remained closed until the time of the explosion. That the door was unquestionably closed at the time of the explosion is evidenced by the fact that the whole door was buckled forward towards the galley after the explosion.

The initial force of the explosion occurred in the steering gear room. The preponderance of evidence shows that the steering gear room was tightly closed for a number of hours prior to the explosion.

The conditions which existed in the steering gear room at and prior to the explosion were conducive for storing gases of an explosive nature.

The Material Service put out from Lockport at 4:50 a. m. on November 30, 1930, bound for Chicago. Between 9 and 9:30 o'clock of the same morning an explosion occurred in the steering gear room. As a result of the explosion, the cook, Charles A. Embury, was so badly burned that he died five days later in the hospital at Berwyn. Gunnar Pearson, the assistant cook, Henry Osby, a mate, and John A.

Nelson, a deckhand, all sustained severe injuries. Delia Embury, who was assisting her husband with the Sunday dinner, and who was on the boat with the consent and at the invitation of the captain, was also injured.

This explosion forced open the doors into the galley, which had been closed, and buckled the steel bulkheads forming the forward portion of the steering gear room forward and knocking down the wooden partitions of the rooms which formed the crew's messroom, cook's room, and seamen's rooms, on the port side and the master's room and a part of the chief engineer's room on the starboard side. The effect of the explosion, in passing from the port side to the starboard side, lifted up the floor of the pilot house and lifted off the roof of the same, which was of wood and in one piece.

The cook, who was in the galley at the time, was burned so badly that he died five days later. The assistant cook, who was also in the galley, was so badly burned that his life was despaired of for a long period of time. A seaman who was just entering the pilot house from the lower deck was burned; the second mate, who was in the pilot house, had his trousers burned off and was burned about the legs; and the man who was doing the steering had his hair burned off and was also burned on the hands. These men were all otherwise injured also.

The explosion originated in the steering gear room. This is conceded alike by the libelants and the respondents. The theory of respondents is that the explosion occurred by reason of an accumulation of carbon monoxide gas, methane gas, and sewer gas in the steering gear room. In their testimony respondents attempt to account for the presence of these gases in explosive quantities in the after part of the vessel. A mixture of these gases, the expert evidence shows, may be sufficient to cause an explosion. Respondents attempt to account for the presence of methane and sewer gas in the steering gear room by reason of the fact that the methane and sewer gases, arising from the putrefaction in the water in the afterpeak tank, were carried into the steering gear room through the gooseneck vents. Presence of carbon monoxide gas is attempted to be accounted for on the theory that the muffler from the Diesel engines was leaking at the flanges in the steering gear room whereby the carbon from the exhaust was discharged into the room. The presence of other dangerous and explosive gases was attempted to be accounted for by reason of the fact that oil was spilled from time to time on the floor. On the other hand, the theory of libelants is that the explosion was caused by a high explosive, such as dynamite, nitroglycerine, or other high explosive, which could be detonated only by a cap or a fuse.

In any event, the outstanding fact is that there was an explosion in the steering gear room causing serious damage to the respondents.

In the view the court takes of the case, it must be decided on the doctrine of res ipsa loquitur. The classic statement of this doctrine is that found in the case of Francey v. Rutland R. Co., 222 N. Y. 482, 119 N. E. 86, 87, in which the court say:

"All that is meant [by the doctrine of res ipsa loquitur] is that the circumstances involved in or connected with an accident are of such an unusual character as to justify, in the absence of any other evidence bearing upon the subject, the inference that the accident was due to the negligence of the one having possession or control of the article or thing which caused the injury. This inference is not drawn merely because the thing speaks for itself, but because all of the circumstances surrounding the accident are of such a character that, unless an explanation be given, the only fair and reasonable conclusion is that the accident was due to some omission of defendant's duty."

This statement of the doctrine is said to be "an admirable statement" in the case of Central R. Co. v. Peluso (C. C. A.) 286 F. 661. In the instant case there was an explosion on a boat. The libelants were in sole possession and control of the boat on which the explosion occurred. Explosions on boats are unusual, and of course they do not just happen of themselves. The accident was one of a most unusual character. All of the circumstances surrounding the accident are of such a character "that, unless an explanation be given, the only fair and reasonable conclusion is that the accident was due to some omission of defendant's duty." Francey v. Rutland R. Co., supra. The court cannot say from all the evidence in the case what particular act caused the explosion. But, applying the doctrine of res ipsa loquitur which

justifies the trier of facts to infer negligence, the court in this case, by reason of the unusualness of an explosion on a boat in the complete control of libelants and by reason of the want of a satisfactory explanation of such explosion, does in this case make the inference of negligence of some kind. The above conclusion the court believes is supported by the cases of Gray v. Baltimore & O. R. Co. (C. C. A.) 24 F.(2d) 671, 59 A. L. R. 461; The Columbia (D. C.) 25 F.(2d) 516; The Rambler (C. C. A.) 290 F. 791; San Juan Light & T. Co. v. Requena, 224 U. S. 99, 32 S. Ct. 399, 56 L. Ed. 680.

◼ It is earnestly contended by counsel for libelant that the doctrine of res ipsa loquitur is inapplicable for two reasons: (1) That the cause of the explosion is unknown; that we do not know what things exploded; and (2) that the doctrine of res ipsa loquitur does not apply when the relationship is that of master and servant or employer and employee, but applies only in cases between carrier and passenger.

Negligence may be inferred and the doctrine of res ipsa loquitur applied from the fact of the explosion itself, although the cause of the explosion is unknown. The Rambler, supra; Gray v. Baltimore & O. R. Co., supra. In The Rambler, supra, the court say:

"The explosion destroyed the Rambler, hurled fragments of vessel and boiler to a great distance, killed the crew on board, and injured property and other persons. From the nature of things there could not be any evidence of what was done or omitted on board the tug immediately before explosion. The reason for disaster remains wholly unknown, so far as any direct evidence of recents acts is concerned. * * *

"The facts upon which liability depends are simple in the extreme. The Rambler's boiler blew up, although of good, if not superior, make, shortly after satisfactory inspection, and while in charge of duly licensed men. By the contention of the petioner, no reason is shown for the explosion. We have no doubt that these facts present a clear case for applying the rule commonly spoken of as that of 'res ipsa loquitur.' Of the nature and effect of this rule we have nothing to add to what we said in Central Railroad v. Peluso, 286 F. 661. But since this is a case of a boiler explosion on shipboard, we refer to the opinion of Wallace, J., in Rose v. Stephens,

etc., Co. (C. C.) 11 F. 438. There a jury was instructed that they might infer negligence from the fact of the explosion; i. e., the explosion spoke for itself. The reason for this rule and its application is, as Wallace, J., remarked:

"'Boilers do not usually explode when they are in a safe condition, and are properly managed; therefore the inference that this boiler was not in a safe condition, or was not properly managed, was justifiable.'

"The court as trier of the facts is like a jury; we may infer negligence from the bald fact of explosion, and we do."

◼ The doctrine of res ipsa loquitur is not limited to carrier and passenger, but also applies where the relationship is that of master and servant or employer and employee. This suit is based upon the act (46 USCA § 688). This act provides in substance that any seaman who shall suffer personal injury in the course of his employment may maintain an action for damages at law, and in such action all statutes of the United States modifying or extending the common-law right of remedy in cases of personal injury or for death to railway employees shall apply. Federal Employers' Liability Act § 1 (45 USCA § 51) provides:

"Every common carrier by railroad * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative * * * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."

Under this act, therefore, the injured employee may recover for injuries inflicted by the negligence of a fellow servant. International Stevedoring Co. v. Haverty, 272 U. S. 50, 47 S. Ct. 19, 71 L. Ed. 157. In the case of Kaemmerling v. Athletic Mining & Smelting Company (C. C. A.) 2 F.(2d) 574, 584, the court, among other things, say:

"When the fellow-servant rule is abolished the doctrine of res ipsa loquitur may properly be applied as between master and servant. * * *

"The latest federal decision on the questions here involved is Baltimore & Ohio

Railway Company v. Kast (C. C. A.) 299 F. 419. The Circuit Court of Appeals of the Sixth Circuit there applied the doctrine of res ipsa loquitur to facts far less cogent than those in the present case. The action arose under the Federal Employers' Liability Act (Comp. St. §§ 8657–8665 [45 USCA §§ 51–59]); which abolishes the fellow-servant rule, and the court makes this one of the important grounds for holding the accident and its attendant circumstances to make out a prima facie case."

In the case of Cochran v. Pittsburg & L. E. R. Co. (D. C.) 31 F.(2d) 769, Judge Westenhaver sitting as District Judge, reviewed at length the various cases bearing upon the application of the doctrine of res ipsa loquitur as between master and servant. Among other things, Judge Westenhaver says:

"The Federal Employers' Liability Act (45 USCA §§ 51–59) supplemented by the Federal Safety Appliance Act (45 USCA § 1 et seq.) has entirely changed the situation. Now an employee of an interstate carrier, injured while engaged in interstate commerce, is entitled to recover as broadly as is an injured passenger."

Further along in the same opinion, Judge Westenhaver says, and his observation is applicable to this case, "It would seem easy, therefore, in the case of such an employee, so to characterize the accident as to warrant the inference of negligence and to exclude the probability of the accident having been caused in a nonnegligent manner. Hence it seems to me that, in a case governed by the Federal Employers' Liability law and the Safety Appliance Act, the res doctrine will be applied, or, to state it differently, that an inference of negligence will arise from the accident whenever it is alleged or proved that the employee was injured in the course of his employment; that the nature of the accident is such as to make it probable that it was the result of negligence, rather than a pure accident or the act of God; that the agency causing the accident was not under the control of the injured employee, but of the master or other employee, for whose negligence the master is now responsible; that the circumstances render it improbable that there was any other cause than negligence in some form for which the master would be liable; and that it was the kind of accident such as does not ordinarily happen if due care is exercised. This is what we call the res doctrine. Such are, in part, the circumstances and conditions in which it is applied."

See, also, the following cases: Chesapeake & Ohio R. Co. v. Smith (C. C. A.) 42 F.(2d) 111; The Rambler, supra; Central R. Co. v. Peluso, supra; Iarussi v. Missouri Pacific R. Co. (C. C.) 155 F. 654.

The position of the court may well be stated in the concluding language of the brief filed on behalf of respondents.

Suffice to say, respondents have proved that they were injured in the course of their employment, and that Embury was killed in the course of his employment; that the nature of the accident was such as to make it probable that it was the result of negligence rather than a pure accident or the act of God; that the agency causing the accident was not under the control of the injured employees, but of the libelant or other employees for whose negligence the libelant is now responsible; that the circumstances of the explosion render it improbable that there was any cause other than negligence in some form, for which libelant would be liable; and that it was the kind of accident such as would not ordinarily happen if due care is exercised.

The court, therefore, finds that the explosion was the result of negligence on the part of libelant, and that libelant is not entitled to exemption from liability, but is entitled to a limitation of its liability as provided by the act of Congress.

The above-entitled suit coming on to be heard, and the court having heard the evidence and arguments of counsel, and briefs having been filed, and the court being advised in the premises, now finds as

Findings of Fact.

(1) The libelant, Leathem Smith-Putnam Navigation Company, was and is a corporation organized and existing under the laws of Illinois, with its principal office in Chicago.

(2) At all times mentioned in the libel herein, the libelant was the sole owner of the motor vessel Material Service and her pending freight.

(3) The Material Service was and is a steel Diesel-engined motor vessel, 240 feet in length, 40 feet in beam, and 15 feet in molded depth, of 1,077 tons gross and 736 tons net register, duly enrolled and licensed under the laws of the United States for navigation upon the lower waters of

Lake Michigan and waters tributary thereto. She was used for carrying cargoes of sand, gravel, and like commodities upon the lower waters ·of Lake Michigan, the Chicago river, and the Sanitary Canal.

(4) At the time of the explosion hereinafter mentioned, and prior thereto, the libelant employed on board the Material Service the respondent Gunnar Pearson as assistant cook, the respondent Henry Osby as mate, the respondent John A. Nelson as watchman, and Charles A. Embury as cook. The respondent Delia Embury, individually, the wife of Charles A. Embury, deceased, was on board the Material Service at the time of the explosion by the permission of the master of said vessel. Delia Embury is also a respondent as administratrix of the estate of Charles A. Embury, deceased, of whose estate she is the duly appointed and qualified administratrix. Said Gunnar' Pearson, Henry Osby, John A. Nelson, and Charles A. Embury were all employed by the libelant as seamen on board said Material Service at the time of said explosion, and they were engaged in the performance of their duties as such employees and seamen on the Material Service.

(5) At about 4:50 a. m. on November 30, 1930, the Material Service left the port of Lockport, Ill., laden with a cargo of gravel, and proceeded upon the Sanitary Canal bound for the port of Chicago, Ill.

(6) The Material Service upon said voyage was in the sole custody and control of libelant. .

(7) The Sanitary Canal and the Chicago river are navigable waters within the state of Illinois, and the death and injuries hereinafter described occurred in Illinois.

(8) From the time that the Material Service left Lockport, Ill., at about 4:50 a. m. on November 30, 1930, until about 9 or 9:30 a. m. upon the same day, she proceeded continuously and without stopping, being during all of said period of time in the sole custody, control, and management of libelant.

(9) Between 9 and 9:30 a. m. on the said day, while the Material Service was so proceeding along the said Sanitary Canal, an explosion occurred in a compartment of the said vessel, which compartment is known as the "steering gear room." The force of the explosion was forward. It communicated itself to the galley, immediately forward of said steering gear room; forward to the crew's quarters on the port side of said vessel, the wooden walls of which were knocked down by the force of the explosion; across the vessel to the starboard side, where the officers' quarters were damaged; forward to the pilot house, the floor of which was torn out and the roof of which was lifted off.

(10) Said explosion on the Material Service did no considerable damage to the steering gear room itself. A sheet of flame accompanied the explosion through the galley door into the galley of the Material Service. The force of the explosion was such that in addition to the damage before mentioned, it threw the chief engineer, weighing about 230 pounds, across his room on the starboard side, which was more than 50 feet away from the situs of the explosion. The length of the flame was sufficient to burn two men in the pilot house, more than 20 feet from the situs of the explosion.

(11) At the time of said explosion Charles A. Embury and Gunnar Pearson were in the galley of the Material Service, Delia Embury was in the crew's quarters forward of said galley, Henry Osby and John A. Nelson were in the pilot house of the Material Service and were blown out of the pilot house by said explosion. As a direct result of said explosion Gunnar Pearson was badly burned and injured, Delia Embury was injured, Henry Osby and John A. Nelson were burned and injured, and Charles A. Embury was so badly burned and injured that he died a few days later from the effects of the explosion.

(12) Said explosion was not caused by any negligence or fault of any of the respondents or by the negligence of said Charles A. Embury.

(13) At the time of the happening of said explosion and long prior thereto, said vessel, Material Service, was in the exclusive custody, management, operation, and control of the libelant. Said explosion was such an unusual occurrence as would not have happened in the ordinary course of things if the libelant had exercised due care in the custody, management, operation, control, and equipment of said vessel, and as a result the inference and finding necessarily follows that said explosion was caused by the negligence of the libelant, particularly as there is no credible evi-

dence in the record to rebut such inference of negligence.

(14) There is no evidence that any dynamite or other powerful explosive was brought aboard the Material Service with any criminal intent at or prior to the time of said explosion.

(15) There is no evidence that any unknown person or persons were on or near the Material Service at the time of or just prior to her sailing from Lockport, Ill., on November 30, 1930.

(16) There is no evidence showing that there was nothing aboard the Material Service that could have caused the explosion.

(17) This court has full, complete, and perfect jurisdiction of the subject-matter of this cause and of the parties thereto.

(18) As the direct result of said explosion, which was caused by the negligence of the libelant as aforesaid, Gunnar Pearson, Henry Osby, John A. Nelson, and Delia Embury sustained injuries and Charles A. Embury sustained injuries from which he died. Libelant is liable to Gunnar Pearson for the injuries he sustained as the result of said explosion, to Henry Osby for the injuries he sustained as the result of said explosion, to John A. Nelson for the injuries he sustained as the result of said explosion, and to Delia Embury as administratrix of the estate of Charles A. Embury, deceased, for the damages she sustained as the result of the death of her husband, Charles A. Embury, and for the pain and suffering he endured as the result of his injuries.

(19) The respondent Delia Embury individually was not employed as a seaman on the Material Service at the time of the explosion, but was on said vessel at such time as an invitee, and libelant is not liable for the bodily injuries she personally sustained as a result of said explosion.

(20) Libelant is not entitled to exemption from all liability as claimed by it in its libel and petition, but it is entitled to limitation of its liability as provided by an act of Congress approved March 3, 1851, now embodied in sections 183 to 185, title 46 United States Code, 46 USCA §§ 183–185 (sections 4283 to 4285, Revised Statutes of the United States), and the various acts and statutes amendatory thereof and supplemental thereto.

Upon the above and foregoing findings of fact, the court states the following:

## Conclusions of Law.

(1) The explosion in the steering gear room of the Material Service on November 30, 1930, was a happening of such an unusual character as to justify, in the absence of any credible evidence bearing upon the subject, the inference that the explosion was due to the negligence of libelant, who had exclusive control of the vessel at the time of the explosion and prior thereto. All of the circumstances surrounding the explosion are of such a character that, unless an explanation is given, the only fair and reasonable conclusion is that the explosion was due to the negligence of the libelant. No reasonable explanation of the explosion was given by libelant, nor was the explosion caused by any negligence of Charles A. Embury, deceased, or of any of the respondents herein. The respondents, Gunnar Pearson, Henry Osby, John A. Nelson, and Delia Embury as administratrix of the estate of Charles A. Embury, deceased, have made out a prima facie case of negligence by invoking the doctrine of res ipsa loquitur. All the elements of the doctrine are present in this case. This prima facie case has not been rebutted by libelant with credible evidence.

(2) Under the law the libelant is liable to Gunnar Pearson for the damages he sustained as the result of said explosion, to Henry Osby for the damages he sustained as the result of said explosion, to John A. Nelson for the damages he sustained as the result of said explosion, to Delia Embury as administratrix of the estate of Charles A. Embury, deceased, for the damages she sustained by the death of her husband, Charles A. Embury, as the result of said explosion, and for the pain and suffering endured by him as the result of the injuries he sustained from said explosion.

## Order.

It is ordered that the foregoing findings of fact and conclusions of law be entered of record in the above-entitled matter.